John A. Russo, City Attorney (SBN 063203)
*jrusso@oaklandcityattorney.org*
Barbara Parker, Chief Asst. City Attorney (SBN 069722)
*bparker@oaklandcityattorney.org*
Mark Morodomi, Supervising Deputy City Attorney (SBN 120914)
*mmorodomi@oaklandcityattorney.org*
Kathleen Salem-Boyd, Deputy City Attorney (SBN 100179)
*ksalemboyd@oaklandcityattorney.org*
CITY OF OAKLAND, CALIFORNIA
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone:    (510) 238-3034
Facsimile:    (510) 238-6500

Richard M. Heimann (SBN 63607)
*rheimann@lchb.com*
Joseph R. Saveri (SBN 130064)
*jsaveri@lchb.com*
Eric B. Fastiff (SBN 182260)
*efastiff@lchb.com*
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, California 94111
Telephone:    (415) 956-1000
Facsimile:    (415) 956-1008

James A. Quadra (SBN 131084)
*quadra@meqlaw.com*
Sylvia Sokol (SBN 200126)
*sokol@meqlaw.com*
MOSCONE, EMBLIDGE & QUADRA, LLP
220 Montgomery Street
Mills Tower, Suite 2100
San Francisco, California 94104
Telephone:    (415) 362-3599
Facsimile:    (415) 362-2006

*Attorneys for Individual and Representative Plaintiff*
*City of Oakland, California*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF OAKLAND, CALIFORNIA, a Municipal Corporation, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AIG FINANCIAL PRODUCTS CORP.; AIG SUNAMERICA LIFE ASSURANCE CO.; BANK *(caption continued on next page)* | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CARTWRIGHT ACT, AND THE UNFAIR COMPETITION LAW**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

1  OF AMERICA CORPORATION; BANK OF
   AMERICA, N.A.; BEAR STEARNS
2  COMPANIES, INC.; CAIN BROTHERS &
   COMPANY, LLC; CDR FINANCIAL
3  PRODUCTS, INC.; FELD WINTERS
   FINANCIAL, LLC; FINANCIAL GUARANTY
4  INSURANCE CO.; FINANCIAL SECURITY
   ASSURANCE HOLDINGS, LTD.; FIRST
5  SOUTHWEST COMPANY; GE FUNDING
   CAPITAL MARKET SERVICES, INC.;
6  GENWORTH FINANCIAL, INC.; GEORGE K.
   BAUM & COMPANY; INVESTMENT
7  MANAGEMENT ADVISORY GROUP, INC.;
   JPMORGAN CHASE & CO.; JPMORGAN
8  CHASE BANK, N.A.; KINSELL NEWCOMB &
   DE DIOS, INC.; LEHMAN BROTHERS INC.;
9  MERRILL LYNCH & CO. INC.; MORGAN
   KEEGAN & CO., INC.; MORGAN STANLEY;
10 NATIONAL WESTMINSTER BANK plc;
   NATIXIS, S.A.; PACKERKISS SECURITIES,
11 INC.; PIPER JAFFRAY & CO.; SECURITY
   CAPITAL ASSURANCE, INC.; SHOCKLEY
12 FINANCIAL CORP.; SOCIÉTÉ GÉNÉRALE;
   SOUND CAPITAL MANAGEMENT, INC.;
13 TRINITY FUNDING COMPANY, LLC; UBS AG;
   UBS SECURITIES LLC; UBS FINANCIAL
14 SERVICES INC.; WACHOVIA BANK, N.A.;
   WACHOVIA CORPORATION; WINTERS & CO.
15 ADVISORS, LLC; XL ASSET FUNDING
   COMPANY 1 LLC; XL CAPITAL, LTD.; and XL
16 LIFE INSURANCE & ANNUITY COMPANY,

17             Defendants.

18

19         Plaintiff City of Oakland, California (hereafter "Oakland" or "Plaintiff"),

20  individually and on behalf of a class of all those similarly situated, brings this action for treble

21  damages under the antitrust laws of the United States against Defendants, demands a trial by jury,

22  and alleges the following on information and belief except as to the contents of paragraphs 1 and

23  16 which are based on personal knowledge:

24                          **NATURE OF THE CASE**

25         1.     The City of Oakland, California has issued hundreds of millions of dollars

26  of tax-free bonds since 1992 and has purchased Guaranteed Investment Contracts ("GICs") to

27  allow Oakland to have funds available while earning a higher rate of return than they would if

28  Oakland simply invested the proceeds in a savings account.  For example, Oakland issued tax-

1  free municipal bonds to, *inter alia*, rebuild the Oakland Coliseum, modernize its sewer system,

2  and provide for general obligations.

3      2.    Oakland alleges a nationwide conspiracy among Defendants to rig bids, to

4  allocate customers and markets, and to fix, raise, maintain, or stabilize the returns received by

5  Oakland and the members of the Class for Municipal Derivatives (as defined below), including

6  but not limited to GICs, sold in the United States.

7      3.    Oakland brings this action on behalf of itself and all entities that contracted

8  for Municipal Derivatives in the United States and its territories directly from Municipal

9  Derivatives Seller Defendants and Municipal Derivatives Broker Defendants, as defined in this

10 Complaint during the period from January 1, 1992 through December 31, 2007.  As a result of

11 Defendants' unlawful conduct, Oakland and the Class, as defined in this Complaint, have paid

12 higher supracompetitive prices for these products, and therefore suffered injury to their business

13 and property.

### JURISDICTION AND VENUE

15     4.    Oakland brings this action pursuant to Section 4 of the Clayton Act,

16 15 U.S.C. §§ 15, for treble damages, as well as reasonable attorneys' fees and costs of suit, for

17 Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Cartwright Act,

18 California Business and Professions Code § 16720, *et seq.*, and the California Unfair Competition

19 Law, Business and Professions Code § 17200, *et seq.*

20     5.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1337, and

21 1367 and by Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

22     6.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and

23 22 and 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period, one or more of the

24 Defendants resided, transacted business, was found, or had agents in this district, and because a

25 substantial part of the events giving rise to Oakland's claims occurred, and a substantial portion

26 of the affected interstate trade and commerce described below was carried out in this district.

27

28

**INTRA-DISTRICT ASSIGNMENT**

7.     Pursuant to Local Rules 3-5(b) and 3-2(c), this action should be assigned to the San Francisco/Oakland Division based on Oakland's location in the County of Alameda.

**DEFINITIONS**

8.     <u>Bid</u>:  As used herein, the term "Bid" means the Rate of Return offered by prospective Municipal Derivatives Sellers during the Competitive Bidding Process for GICs or the competitive processes by which other Municipal Derivatives are purchased by Government Entities.

9.     <u>Competitive Bidding Process</u>:  As used herein, the term "Competitive Bidding Process" means the process mandated by Treasury Regulation §148.5, *et seq.*, and detailed below in Paragraphs 74 through 92, by which at least three Municipal Derivatives Sellers submit Bids to the Municipal Derivatives Broker retained by the Government Entity seeking to purchase a Guaranteed Investment Contract, as that term is defined herein.

10.     <u>Government Entity</u>:  As used herein, the term "Government Entity" means any state, local or municipal body or any subdivision thereof.  Excluded from the definition of Government Entity is any federal government body.

11.     <u>Municipal Derivative</u>:  As used herein, the term "Municipal Derivative" means a variety of financial instruments that Government Entities use to invest the proceeds of bond offerings while waiting to use bond proceeds for their purposes or to hedge and shift the interest-rate risk associated with the issuance of tax-exempt debt.  As used herein, the term Municipal Derivative encompasses all of the following types of transactions:

a.     <u>Guaranteed Investment Contract ("GIC")</u>:  "Guaranteed Investment Contract" or "GIC" is a security in which a Government Entity contracts with a Municipal Derivative Counterparty, typically an investment bank or bond insurer with an AAA or AA credit rating, to invest the proceeds of a municipal bond offering for a fixed amount of time in exchange for a series of payments at a guaranteed Rate of Return over the life of the contract.  A GIC is a Municipal Derivative, and are sometimes characterized as "forward purchase," "forward delivery or "repurchase" agreements (typically used for debt service funds), or as "unsecured" GICs

(typically used for capital projects and subject to provisions allowing investment principal to be drawn down pursuant to a set schedule).  A GIC is similar to a bond, in that "principal" – the proceeds of a municipal bond issue – is invested in exchange for payment of a certain fixed Rate of Return determined by the terms of the contract.

b.    <u>Advance Refunding Escrow</u>:  An "advance refunding escrow" is an arrangement by which the proceeds of a refunding issue (a bond issued to refund an outstanding bond) are deposited into an escrow account for investment in an amount sufficient to pay the principal of, and interest on, the underlying issue to be refunded on the original interest payment and maturity dates.

c.    <u>Swap</u>:  A "swap" is a type of agreement frequently used to minimize the interest rate risk Government Entities face when issuing large amounts of tax-exempt debt obligations.  A swap involves two Counterparties – the Government Entity and a Municipal Derivatives Seller – and is essentially the sale of an instrument and the simultaneous purchase of another instrument for purposes of enhancing the Counterparties' respective holdings. Government Entities use swaps to achieve desired tax results, or to alter or protect various features of an existing municipal bond portfolio.  There are several types of swaps:  (a) floating-for-fixed interest swap; (b) fixed-for-floating interest swap; and (c) floating-for-floating (basis-rate) swap, where the two are based on different indices (typically the LIBOR or BMA indices). Government Entities, even those with sophisticated and experienced municipal finance departments, retain a Municipal Derivatives Broker (including many of those named as Defendants herein) as "swap advisors" to aid in the swap transaction.

d.    <u>Option</u>:  An "option" is one of two types of agreements used to shift a Government Entity's tax-exempt securities holdings typically acquired in association with issuance of municipal bonds.

i.    A <u>Put Option</u> is a provision in a bond contract where the investor has the right, on specified dates after required notification, to surrender the securities to the issuer or the issuer's agent at the predetermined price (usually par value).

ii.    A <u>Call Option</u> is a transaction where the issuer repays to the holder of an outstanding security the principal amount thereof (plus, in certain cases, an additional amount representing a redemption premium) as a result of the issuer exercising a right under the bond contract to repay the security prior to its scheduled maturity date (often referred to as the "call").

e.    <u>Swaption:</u> A "Swaption" is the combination of a Swap and an Option.

f.    <u>Interest Rate Floors and Collars:</u> Interest rate "floors" and "collars" are agreements in which a Government Entity agrees with a Municipal Derivatives Seller (the Counterparty) to pay fixed rates of interest on an investment of variable-rate debt, either agreeing to pay the Counterparty an interest rate at or above a specified rate (a "floor") or no more or less than a particular interest rate within range of interest rates (a "collar").

12.    <u>Municipal Derivatives Broker</u>: As used herein, the term "Derivatives Broker" means an entity retained by a Government Entity to oversee the processes, including the Competitive Bidding Process, pursuant to which Municipal Derivatives are purchased. Derivatives Brokers act as fiduciaries of a Government Entity seeking to purchase Municipal Derivatives, often acting as swap advisors in addition to overseeing the competitive bidding undertaken by the Government Entity for those Municipal Derivatives sold through ostensibly competitive means. Derivatives Brokers enjoy mutually symbiotic and incestuous relationships with large investment banks and insurance companies, and act as "finders" of municipal securities business for the securities dealers or investment banks that often pay kickbacks to the Municipal Derivatives Brokers in the form of finders' fees and monthly retainers.

13.    <u>Municipal Derivatives Counterparty</u>:  As used herein, the term "Municipal Derivatives Counterparty" or "Counterparty" means a Municipal Derivatives Seller with whom a Government Entity contracts for a transaction involving the purchase of one or more of the Municipal Derivatives described herein.

14.    <u>Municipal Derivatives Seller</u>: As used herein, the term "Derivatives Seller" means an entity offering to enter into a Municipal Derivative transaction with a Government Entity pursuant to the Competitive Bidding Process or other competitive process.

15.    <u>Rate of Return</u>: As used herein, the term "Rate of Return" means the fixed amount, typically expressed as a percentage of the underlying bond proceeds amount or as a specific interest rate, offered by a potential Municipal Derivatives Seller and ultimately received by a Government Entity after it enters into the GIC or similar Municipal Derivative transaction with a Municipal Derivatives Counterparty.  The Rate of Return is an element of the Competitive Bidding Process where competition is intended to occur for the benefit of bond issues.  It was a focus of Defendants' illegal bid-rigging and customer allocation scheme alleged herein.

**PARTIES**

**Plaintiff**

16.    Plaintiff, the City of Oakland, California, is a municipal corporation and a Government Entity.  Oakland purchased Municipal Derivatives, including from one or more Derivatives Seller Defendants pursuant to a Competitive Bidding Process overseen by one or more of the Derivative Broker Defendants during the Class Period.  Oakland purchased millions of dollars' worth of Municipal Derivatives from one or more of the Derivatives Seller Defendants and retained one or more of the Derivatives Broker Defendants to oversee, supervise and manage the processes, including the Competitive Bidding Process, undertaken to purchase the Municipal Derivatives.  As a result of the unlawful conspiracy alleged herein, Oakland was injured in its business or property.  Oakland has contracted for its GICs with a variety of brokers and underwriters, including Bank of America, FSA Management (a subsidiary of Financial Security Assurance Holdings, Ltd.) and IXIS Corporate & Investment Banking, on which the Department of Justice has served subpoenas as part of its investigation into Municipal Derivative bid-rigging.

**Municipal Derivatives Seller Defendants**

17.    Defendant AIG Financial Products Corp. ("AIG Financial") is a Delaware corporation maintaining its principal place of business in Wilton, Connecticut.  It is a wholly

1  owned subsidiary of AIG International Inc.  During the Class Period, AIG Financial issued and

2  sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

3           a.       AIG Financial is part of the Capital Markets arm of its parent

4  company AIG, and raises funds for AIG in part through investment in Municipal Derivatives.

5           b.       In November, 2006, AIG Financial received a subpoena from the

6  Antitrust Division of the United States Department of Justice in connection with its grand jury

7  investigation into anticompetitive conduct in the Municipal Derivatives business.

8          18.       Defendant AIG SunAmerica Life Assurance Co., ("AIG SunAmerica") is

9  an Arizona corporation maintaining its principal place of business in Los Angeles, California.

10  During the Class Period, AIG SunAmerica issued and sold Municipal Derivatives to Oakland

11  and/or members of the Class in the United States.

12           a.       In November, 2006, AIG SunAmerica received a subpoena from

13  the Securities and Exchange Commission in connection with the SEC's investigation into

14  anticompetitive practices in the Municipal Derivatives industry.

15          19.       Defendant Bank of America Corporation ("BOA") is a Delaware

16  corporation with its principal place of business in Charlotte, North Carolina.  During the time

17  period covered by this complaint, Bank of America was headquartered in San Francisco,

18  California and conducted substantial business operations in this judicial district.  During the Class

19  Period, BOA issued and sold Municipal Derivatives to Oakland and/or members of the Class in

20  the United States, either directly or through its wholly-owned subsidiary Defendant Bank of

21  America, N.A ("BANA").

22          20.       Defendant Bank of America, N.A. ("BANA"), a wholly-owned subsidiary

23  of Defendant BOA, is a Delaware corporation with its principal place of business in Charlotte,

24  North Carolina.  During the Class Period, BANA issued and sold Municipal Derivatives to

25  Oakland and/or members of the Class in the United States.

26           a.       In November, 2006, BOA received subpoenas from the Antitrust

27  Division of the United States Department of Justice and the Securities and Exchange Commission

28

1   in connection with those agencies' investigations into anticompetitive conduct in the Municipal

2   Derivatives business.

3              b.        In February, 2007, BOA entered into a Corporate Conditional

4   Leniency agreement with the DOJ in connection with the antitrust investigation into

5   anticompetitive conduct in the Municipal Derivatives business, indicating that BOA had engaged

6   in potentially criminal anti-competitive conduct in relation to the Municipal Derivatives industry.

7   Such leniency agreements, which insulate the corporate applicant from criminal antitrust

8   prosecution as long as it cooperates, are only entered into after the cooperating company has

9   proactively offered the DOJ evidence of *per se* violations of the antitrust laws.  Such leniency

10  agreements only cover criminal antitrust violations, and do not insulate companies from criminal,

11  civil or administrative actions in other areas.

12             c.        On February 4, 2008, Defendant BOA's subsidiary BANA received

13  a so-called Wells notice from the SEC, advising the company that the SEC staff has

14  recommended that the SEC bring a civil or administrative action against BANA in connection

15  with its investigation of anticompetitive practices in the Municipal Derivatives industry.

16             d.        BOA and BANA are also targets of investigation by the Internal

17  Revenue Service ("IRS") in connection with anticompetitive practices in the Municipal

18  Derivatives industry.  In February, 2007, concurrently with its entrance into the DOJ's Corporate

19  Leniency agreement covering criminal antitrust violations,  BOA entered into an agreement with

20  the IRS related to BOA's role in providing GICs and other agreements in connection with certain

21  "blind pool" municipal bond transactions.

22             e.        BOA has also been implicated in a bid-rigging and kickback

23  scheme involving a large GIC that BOA sold to the City of Atlanta in 2002 that also involved

24  Derivative Broker Defendants CDR and Feld Winters as well as Derivative Seller Defendants

25  UBS and Piper Jaffray.

26             21.       Defendant Bear Stearns Companies, Inc. ("Bear Stearns") is a Delaware

27  corporation with its principal place of business in New York, New York.  During the Class

28

1    Period, Bear Stearns issued and sold Municipal Derivatives to Oakland and/or members of the

2    Class in the United States.

3                    a.    The SEC has previously investigated Bearn Stearns' municipal

4    bond department and its municipal bond underwriting practices.

5                    b.    Stephen Salvadore, currently the Senior Managing Director and

6    Manager of Municipal Capital Markets Derivatives and Investments at Bear Stearns, has

7    disclosed that he is a target of the grand jury convened in the Southern District of New York by

8    the Antitrust Division of the Department of Justice investigating antitrust and other violations

9    related to anticompetitive conduct in the Municipal Derivatives business. Target letters of the

10   kind received by Salvadore are an indication that the DOJ has substantial evidence of the

11   commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

12   plea agreement or cooperation deal.

13                   c.    In addition, at least one former Bear Stearns employee is a target of

14   both the SEC and the grand jury convened in the Southern District of New York by the Antitrust

15   Division of the Department of Justice investigating antitrust and other violations related to

16   anticompetitive conduct in the Municipal Derivatives business.

17                   d.    Patrick Marsh, who worked at Bear Stearns from 2000 to 2005 and

18   whose last position at the company was Managing Director and Chief of Municipal Structuring,

19   has disclosed that he was the recipient of a Wells notice from the SEC recommending civil or

20   administrative action against him in connection with securities violations related to bidding

21   procedures in the Municipal Derivatives industry during his tenure at Bear Stearns.  Marsh also

22   disclosed that he is a target of the grand jury convened in the Southern District of New York by

23   the Antitrust Division of the Department of Justice investigating antitrust and other violations

24   related to anticompetitive conduct in the Municipal Derivatives business.  Target letters of the

25   kind received by Marsh are an indication that the DOJ has substantial evidence of the commission

26   of a federal crime and typically a sign that the recipient will soon be indicted absent a plea

27   agreement or cooperation deal.  Marsh was also subpoenaed by the SEC in connection with its

28

1  investigation into wrongdoing associated with municipal bond derivatives transactions in

2  Jefferson County, Alabama.

3      22.    Defendant Financial Guaranty Insurance Co. ("FGIC") is a Delaware

4  corporation maintaining its principal place of business in New York, New York.  During the

5  Class Period, FGIC, a former affiliate of General Electric, issued and sold Municipal Derivatives

6  to Oakland and/or members of the Class in the United States.

7      a.    FGIC has received a subpoena from the Securities and Exchange

8  Commission in connection with the SEC's investigation into anticompetitive practices in the

9  Municipal Derivatives industry.

10     23.    Defendant Financial Security Assurance Holdings, Ltd. ("FSA Holdings")

11 is a New York corporation maintaining its principal place of business in New York, New York.

12 During the Class Period, FSA Holdings issued and sold Municipal Derivatives to Oakland and/or

13 members of the Class in the United States, either directly or through its wholly-owned subsidiary

14 FSA Capital Management Services, LLC, ("FSA Capital"), a Delaware limited liability company

15 headquartered in New York City.

16     a.    In November, 2006 FSA Holdings received subpoenas from the

17 Antitrust Division of the United States Department of Justice and the Securities and Exchange

18 Commission in connection with those agencies' investigations into anticompetitive conduct in the

19 Municipal Derivatives business.

20     b.    On February 4, 2008, FSA Holdings received a so-called Wells

21 notice from the Philadelphia regional office of the SEC, informing the company that the SEC

22 staff had recommended civil or administrative action against FSA Holdings in connection with its

23 investigation into anticompetitive practices in the Municipal Derivatives industry.  The Wells

24 notice issued to FSA Holdings related to alleged violations of Section 10(b) of the Securities

25 Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

26     24.    Defendant First Southwest Company ("First Southwest") is a Delaware

27 corporation with its principal place of business in Dallas, Texas.  During the Class Period, First

28

1   Southwest issued and sold Municipal Derivatives to Oakland and/or members of the Class in the

2   United States.

3              a.    First Southwest has received a subpoena from the Securities and

4   Exchange Commission in connection with the SEC's investigation into anticompetitive practices

5   in the Municipal Derivatives industry.

6          25.    Defendant Genworth Financial, Inc. ("Genworth") is a New York

7   corporation maintaining its principal place of business at Fairfield, Connecticut.  Genworth issued

8   and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

9              a.    Genworth has received subpoenas from the Antitrust Division of

10  the United States Department of Justice and the Securities and Exchange Commission in

11  connection with those agencies' investigations into anticompetitive conduct in the Municipal

12  Derivatives business.

13         26.    Defendant GE Funding Capital Market Services, Inc. ("GE Funding") is a

14  Delaware corporation maintaining its principal place of business in New York, New York.  GE

15  Funding is a member of the GE Funding Capital Market Services Group (GE Funding CMS).

16  During the Class Period, GE Funding issued and sold Municipal Derivatives to members of the

17  Class.

18         27.    Defendant JPMorgan Chase & Co. ("JPMorgan") is a Delaware

19  corporation maintaining its principal place of business in New York, New York.  During the

20  Class Period, JPMorgan issued and sold Municipal Derivatives to Oakland and/or members of the

21  Class in the United States.

22             a.    In November, 2006, JPMorgan received subpoenas from the

23  Antitrust Division of the United States Department of Justice and the Securities and Exchange

24  Commission in connection with those agencies' investigations into anticompetitive conduct in the

25  Municipal Derivatives business.

26             b.    At least three former JPMorgan employees are targets of the Justice

27  Department's grand jury investigation into anticompetitive practices in the Municipal Derivatives

28  industry.

1       c.     Samuel Gruer, who worked at JPMorgan from 1994 through 2006

2  and whose last position was Vice-President in the Derivatives Marketing unit of the company's

3  Tax-Exempt Capital Markets Group, has recently disclosed that he is a target of the grand jury

4  convened in the Southern District of New York by the Antitrust Division of the Department of

5  Justice investigating antitrust and other violations related to anticompetitive conduct in the

6  Municipal Derivatives business.  Target letters of the kind received by Gruer are an indication

7  that the DOJ has substantial evidence of the commission of a federal crime and typically a sign

8  that the recipient will soon be indicted absent a plea agreement or cooperation deal.

9       d.     Shlomi Raz, who worked at JPMorgan from 1992 to 2003, has also

10  recently disclosed that he is a target of the grand jury convened in the Southern District of New

11  York by the Antitrust Division of the Department of Justice investigating antitrust and other

12  violations related to anticompetitive conduct in the Municipal Derivatives business.  Target letters

13  of the kind received by Raz are an indication that the DOJ has substantial evidence of the

14  commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

15  plea agreement or cooperation deal.

16       e.     James Hertz, who worked at JPMorgan from 1994 until he was

17  fired from the firm in January, 2008, has also recently disclosed that JPMorgan informed him that

18  he was under investigation by the DOJ for what Hertz described as "conduct on the municipal

19  derivatives marketing desk," an indication that the investigation involves JPMorgan's entire

20  municipal derivatives business, which necessarily includes Municipal Derivatives.  Target letters

21  of the kind received by Hertz are an indication that the DOJ has substantial evidence of the

22  commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

23  plea agreement or cooperation deal.

24       28.     Defendant JPMorgan Chase Bank, N.A. ("JPMorgan N.A.") is a national

25  banking association with headquarters in Ohio, and is a subsidiary of JP Morgan Chase.  During

26  the Class Period, JPMorgan N.A. issued and sold Municipal Derivatives to Oakland and/or

27  members of the Class in the United States.

28

29.    Defendant Kinsell Newcomb & DeDios Inc. ("KND") is a California corporation with its principal place of business in Solano Beach, California. During the Class Period, KND issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

a.    KND has received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

30.    Defendant Lehman Brothers Inc. ("Lehman Brothers") is a Delaware corporation maintaining its principal place of business in New York, New York. During the Class Period, Lehman Brothers issued and sold Municipal Derivatives to members of the Class. Lehman is a wholly-owned subsidiary of Lehman Brothers Holdings Inc.

31.    Defendant Merrill Lynch & Co. Inc. ("Merrill Lynch") is a Delaware corporation maintaining its principal place of business in New York, New York. During the Class Period, Merrill Lynch issued and sold Municipal Derivatives to members of the Class.

32.    Defendant Morgan Stanley ("Morgan Stanley") is a Delaware corporation maintaining its principal place of business in New York, New York. During the Class Period, Morgan Stanley issued and sold Municipal Derivatives to members of the Class.

33.    Defendant National Westminster Bank plc ("NatWest") is a public limited corporation maintaining its principal place of business in London, England. During the Class Period, NatWest issued and sold Municipal Derivatives to members of the Class. NatWest is a subsidiary of Royal Bank of Scotland.

34.    Defendant Natixis, S.A. ("Natixis"), formerly known as IXIS Corporate & Investment Bank and CDC Funding Corp., is a foreign corporation maintaining its principal place of business in Paris, France. During the Class Period, Natixis issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

a.    In November, 2006, Natixis' predecessor IXIS Corporate & Investment Bank received a subpoena from the Antitrust Division of the United States

1    Department of Justice in connection with its grand jury investigation into anticompetitive conduct

2    in the Municipal Derivatives business.

3         35.    Defendant Piper Jaffray & Co. ("Piper Jaffray") is a Delaware corporation

4    with its principal place of business in Minneapolis, Minnesota.  During the Class Period, Piper

5    Jaffray issued and sold Municipal Derivatives to Oakland and/or members of the Class in the

6    United States.

7         a.    Piper Jaffray has received subpoenas from the Antitrust Division of

8    the United States Department of Justice and the Securities and Exchange Commission in

9    connection with those agencies' investigations into anticompetitive conduct in the Municipal

10   Derivatives business.

11        b.    James Towne, employed as Managing Director of Piper Jaffray's

12   municipal derivatives group until January, 2008, recently disclosed that Piper Jaffray informed

13   him that he is under investigation by the Antitrust Division of the Department of Justice for

14   potential antitrust and other violations relating to the Municipal Derivatives industry.

15        36.    Defendant Security Capital Assurance, Inc. ("Security Capital") is a

16   foreign corporation maintaining its principal place of business in Hamilton, Bermuda.  During the

17   Class Period, Security Capital, either directly or through its affiliates Defendants XL Capital, Ltd.

18   and XL Asset Funding Company 1 LLC, issued and sold Municipal Derivatives to Oakland

19   and/or members of the Class in the United States.

20        37.    Defendant Société Générale ("SocGen") is a French corporation

21   headquartered in Paris.  During the Class Period, SocGen issued and sold Municipal Derivatives

22   to Oakland and/or members of the Class in the United States, either directly or through its wholly-

23   owned subsidiaries Société Générale Americas, Inc., a Delaware corporation headquartered in

24   New York, New York and/or SG Americas Securities, LLC, a Delaware limited liability

25   corporation also headquartered in New York, New York.

26        a.    SocGen has received a subpoena from the Securities and Exchange

27   Commission in connection with the SEC's investigation into anticompetitive practices in the

28   Municipal Derivatives industry.

1                b.      SocGen's Municipal Derivatives business is being scrutinized by

2 the IRS, which is investigating improper kickbacks to Defendant CDR related to a GIC brokered

3 by CDR.

4           38.     Defendant Trinity Funding Company, LLC ("GE Trinity") is a New York

5 limited liability corporation maintaining its principal place of business in New York, New York.

6 GE Trinity is a member of the GE Funding Capital Market Services Group (GE Funding CMS).

7 During the Class Period, GE Trinity issued and sold Municipal Derivatives to members of the

8 Class.

9           39.     Defendant UBS AG ("UBS") is a Swiss corporation with its headquarters

10 in Basel, Switzerland. During the Class Period, UBS issued and sold Municipal Derivatives to

11 Oakland and/or members of the Class in the United States, either directly or through its wholly-

12 owned subsidiary, Defendant UBS Securities, LLC ("UBS Securities").

13           a.      In November, 2006, UBS received subpoenas from the Antitrust

14 Division of the United States Department of Justice and the Securities and Exchange Commission

15 in connection with those agencies' investigations into anticompetitive conduct in the Municipal

16 Derivatives business.

17           b.      On February 4, 2008, UBS received a so-called Wells notice from

18 the Philadelphia regional office of the SEC advising the company that the SEC staff had

19 recommended that the SEC bring a civil action against UBS in connection with the

20 anticompetitive practices associated with municipal bond derivatives.

21           c.      Peter Ghavami, until December 2007 the Managing Director and

22 Co-Manager of Municipal Derivatives at UBS Securities in New York and London, recently

23 disclosed that he is a target of the grand jury convened in the Southern District of New York by

24 the Antitrust Division of the Department of Justice investigating antitrust and other violations

25 related to anticompetitive conduct in the Municipal Derivatives business. Target letters of the

26 kind received by Ghavami are an indication that the DOJ has substantial evidence of the

27 commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

28 plea agreement or cooperation deal.

40.    Defendant UBS Securities LLC, formerly known as UBS Warburg LLC, is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of UBS AG. During the Class Period, UBS Securities issued and sold Municipal Derivatives to members of the Class.

41.    Defendant UBS Financial Services Inc. ("UBS Financial"), formerly known as PaineWebber Inc., is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of UBS AG. In 2000, UBS Financial was purchased by Defendant UBS AG. During the Class Period, UBS Financial issued and sold Municipal Derivatives to members of the Class.

42.    Defendant Wachovia Bank, N.A. ("Wachovia N.A.") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. During the Class Period, Wachovia N.A. issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

43.    Defendant Wachovia Corporation ("Wachovia") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. During the Class Period, Wachovia issued and sold Municipal Derivatives to Oakland and/or members of the Class in the United States either directly or through its wholly-owned subsidiary Defendant Wachovia Bank, N.A. ("Wachovia N.A.").

a.    In November, 2006, Wachovia received subpoenas from the Antitrust Division of the United States Department of Justice and the Securities and Exchange Commission in connection with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives business.

b.    Both the DOJ and the SEC have advised Wachovia that they believe Wachovia N.A. employees engaged in improper conduct in relation to competitively-bid municipal derivatives transactions.

c.    Two Wachovia N.A. employees working in the company's Derivatives Marketing Department, Martin McConnell (the Managing Director of Marketing) and Paul Jay Saunders (the Director of Marketing), recently disclosed that they are targets of the

1  grand jury convened in the Southern District of New York by the Antitrust Division of the

2  Department of Justice investigating antitrust and other violations related to anticompetitive

3  conduct in the Municipal Derivatives business.  Target letters of the kind received by McConnell

4  and Saunders are an indication that the DOJ has substantial evidence of the commission of a

5  federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement

6  or cooperation deal.  Wachovia recently placed both Saunders – who worked for Defendant Bank

7  of America from 1998 through 2003 – and McConnell on administrative leave following their

8  disclosure that they were targets of the government's grand jury investigation.

9       44.    Defendant XL Asset Funding 1, LLC ("XLAF") is a Delaware limited

10  liability corporation maintaining its principal place of business in Schaumberg, Illinois.  During

11  the Class Period, XLAF issued and sold Municipal Derivatives to Oakland and/or members of the

12  Class in the United States.

13       a.    XLAF received subpoenas from the Antitrust Division of the

14  United States Department of Justice and the Securities and Exchange Commission in connection

15  with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives

16  business.

17       45.    Defendant XL Life Insurance & Annuity Company ("XL Life Insurance")

18  is a subsidiary of XLAF maintaining its principal place of business in Schaumburg, Illinois.

19  During the Class Period, XL Life Insurance issued and sold Municipal Derivatives to Oakland

20  and/or members of the Class.

21       46.    Defendant XL Capital, Ltd. ("XL Capital") is a foreign corporation

22  maintaining its principal place of business in Hamilton, Bermuda.  During the Class Period, XL

23  Capital, either directly or through its affiliates Defendants Security Capital and XL Asset Funding

24  1, LLC issued and sold Municipal Derivatives to Oakland and/or members of the Class in the

25  United States.

26  **Municipal Derivatives Broker Defendants**

27       47.    Defendant Cain Brothers & Company, LLC ("Cain") is a Delaware limited

28  liability corporation with its principal place of business in New York, New York.  During the

1  Class Period, Cain acted as a broker for Oakland and/or members of the Class in purchasing

2  Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

3           a.      Cain was subpoenaed by the SEC in connection with its

4  investigation of anticompetitive practices in the Municipal Derivatives industry.

5           48.     Defendant CDR Financial Products, Inc. ("CDR") is a Delaware

6  corporation maintaining its principal place of business at Beverly Hills, California.  During the

7  Class Period, CDR acted as a broker for Oakland and/or members of the Class in purchasing

8  Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

9           a.      CDR's California offices were raided by the FBI in November,

10  2006, at the start of the government's investigation into anticompetitive conduct in the Municipal

11  Derivatives market.

12           b.      CDR has been the subject of a series of long-standing federal

13  governmental investigations involving its dealings with other participants in the municipal

14  derivatives market, including Defendant Bank of America.

15           49.     Defendant Feld Winters Financial, LLC ("Feld Winters"), is a California

16  limited liability corporation with its principal place of business in Sherman Oaks, California.

17  During the Class Period, Feld Winters acted as a broker for Oakland and/or members of the Class

18  in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

19  Defendants.

20           a.      Feld Winters was subpoenaed by the Justice Department in

21  connection with its investigation of anticompetitive conduct in the Municipal Derivatives

22  business.

23           50.     Defendant George K. Baum & Company ("Baum") is a Missouri

24  corporation with its principal place of business in Kansas City, Missouri.  During the Class

25  Period, Baum acted as a broker for Oakland and/or members of the Class in purchasing Municipal

26  Derivatives from one or more of the Municipal Derivatives Seller Defendants.

27           a.      Baum was subpoenaed by the SEC in connection with its

28  investigation of anticompetitive practices in the Municipal Derivatives industry.

1                           b.       Baum has been the target of previous governmental investigations

2       related to its Municipal Derivatives business.

3                           c.       On November 10, 2006, Baum settled allegations with the IRS that

4       it diverted profits from municipal bond deals.  In one instance the IRS alleged that bidding was

5       rigged in the selection of a GIC provider for a $150 million loan pool underwritten by Baum in

6       1999 and issued by the Illinois Development Finance Authority.

7                   51.      Defendant Investment Management Advisory Group, Inc. ("IMAGE") is a

8       Pennsylvania corporation maintaining its principal place of business at Pottstown, Pennsylvania.

9       During the Class Period, IMAGE acted as a broker for Oakland and/or members of the Class in

10      purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

11      Defendants.

12                          a.       IMAGE's Pennsylvania offices were raided by the FBI in

13      November, 2006, at the start of the government's investigation into anticompetitive conduct in the

14      Municipal Derivatives market.

15                  52.      Defendant Morgan Keegan & Co., Inc. ("Morgan Keegan"), a subsidiary of

16      Regions Financial Corp., is a Tennessee corporation maintaining its principal place of business in

17      Memphis, Tennessee.  During the Class Period, Morgan Keegan acted as a broker for Plaintiff

18      and/or members of the Class in purchasing Municipal Derivatives from one or more of the

19      Municipal Derivatives Seller Defendants.

20                          a.       Morgan Keegan has received a subpoena from the Securities and

21      Exchange Commission in connection with the SEC's investigation into anticompetitive practices

22      in the Municipal Derivatives industry.

23                  53.      Defendant PackerKiss Securities, Inc. ("PackerKiss") is a Florida

24      corporation maintaining its principal place of business in Delray Beach, Florida.  During the

25      Class Period, PackerKiss acted as a broker for Plaintiff and/or members of the Class in

26      purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

27      Defendants.

28

54. Defendant Shockley Financial Corp. ("Shockley"), a subsidiary of NelNet Inc., is a corporation maintaining its principal place of business in Aurora, Colorado. During the Class Period, Shockley acted as a broker for Plaintiff and/or members of the Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

55. Defendant Sound Capital Management, Inc. ("Sound Capital") is a Minnesota corporation maintaining its principal place of business at Eden Prairie, Minnesota. During the Class Period, Sound Capital acted as a broker for Oakland and/or members of the Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

a. Sound Capital's Minnesota offices were raided by the FBI in November, 2006, at the start of the government's investigation into anticompetitive conduct in the Municipal Derivatives market.

56. Defendant Winters & Co. Advisors, LLC ("Winters") is a California limited liability company maintaining its principal place of business in Los Angeles, California. During the Class Period, Winters acted as a broker for Plaintiff and/or members of the Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

## CO-CONSPIRATORS

57. Various other persons, firms and corporations, not named as Defendants herein, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.

58. Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

**CLASS ACTION ALLEGATIONS**

59.    Oakland brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All state, local or municipal Government Entities and private entities in the United States and its territories that purchased Municipal Derivatives directly from one or more of the Municipal Derivatives Seller Defendants and/or through one or more of the Derivatives Broker Defendants at any time from January 1, 1992 through December 31, 2007. Excluded from the Class are all federal governmental entities and instrumentalities of the federal government.

60.    Oakland does not know the exact number of Class members because such information is in the exclusive control of Defendants. But due to the nature of the trade and commerce involved, Oakland believes that there are hundreds or thousands of Class members as described above, the exact number and their identities being known by Defendants.

61.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

62.    There are questions of law and fact common to the Class, including:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the effective prices of Municipal Derivatives sold in the United States;

b.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to rig bids for Municipal Derivatives sold in the United States;

c.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to allocate customers and the markets for Municipal Derivatives sold in the United States;

d.    The identity of the participants of the alleged conspiracy;

e.    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

f.    Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

g.    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, violated the California Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.*;

h.    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, violated the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*;

i.    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Oakland and the other members of the Class;

j.    The effect of the alleged conspiracy on the effective prices of Municipal Derivatives sold in the United States during the Class Period;

k.    Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Oakland and the other members of the Class; and

l.    The appropriate class-wide measure of damages.

63.    Oakland is a member of the Class, Oakland's claims are typical of the claims of the Class members, and Oakland will fairly and adequately protect the interests of the Class.  Oakland is a direct purchaser of Municipal Derivatives, and its interests are coincident with, and not antagonistic to, those of the other members of the Class.

64.    Oakland is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

65.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

66.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

67.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which records should exist.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This class action presents no difficulties in management that would preclude maintenance as a class action.

## TRADE AND INTERSTATE COMMERCE

68.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

69.     During the Class Period, Defendants and their co-conspirators issued and sold substantial quantities of Municipal Derivatives, in a continuous and uninterrupted flow of interstate commerce to Government Entities located in states other than the states in which the Municipal Derivatives Seller Defendants issued and/or brokered these products.

70.     The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on United States commerce.

## FACTS

### The Market for Municipal Derivatives

71.     Municipalities and state and local government agencies issue over $2 trillion worth of municipal bonds annually.

72.     While the tax-free bonds are sold in contemplation of construction, public housing or other public-works projects, municipalities have in the last decade opted to invest the proceeds of the bond sales before these projects are even started, or to hedge the interest-rate risk associated with the issuance of large amounts of tax-exempt debt.

73.     Municipal Derivatives have become an attractive investment vehicle for municipalities looking to park bond proceeds until the money raised from the sale is actually needed for capital projects, or to protect themselves from interest-rate risk associated with issuing

1   their tax-exempt bonds.  There are roughly $40 - $60 billion in Municipal Derivatives created in

2   the United States annually.

3          74.    The market for Municipal Derivatives has become more concentrated since

4   the late 1990's, with an increasingly smaller number of investment banks and bond insurers

5   occupying the market.

6          75.    The Municipal Derivatives industry has been variously described by

7   market participants as opaque, intertwined and interconnected, all characteristics which facilitate

8   the type of illegal collusion alleged herein.  The Municipal Derivatives market lacks transparency,

9   and regulatory and private efforts to impose transparency have not been successful.  On July 26,

10  2007, the Chairman of the Securities and Exchange Commission delivered a white paper to

11  Congress calling for improved oversight of the municipal securities market.

12                         **The Competitive Bidding Process**

13         76.    A wide variety of Municipal Derivatives are sold through competitive

14  bidding undertaken by Government Entities and overseen by the Municipal Derivatives Brokers

15  acting as their fiduciaries.

16         77.    The Competitive Bidding Process involving GICs is illustrative of the way

17  many Government Entities purchase Municipal Derivatives, and indicative of the methods by

18  which the Defendants have succeeded in manipulating these financial instruments pursuant to

19  their bid-rigging and customer allocation conspiracy.

20         78.    Flush with proceeds from a muni bond sale, a Government Entity looks to

21  invest in a GIC.  The Government Entity will retain a GIC Broker to facilitate the acquisition of

22  the contract.  The Government Entities typically pay a fee to the GIC Broker for shopping for

23  GIC Bids.

24         79.    In the wake of the so-called "yield-burning" scandal of the 1980's and

25  1990's – in which municipal bond issuers were sold overpriced investment vehicles or charged

26  fees that acted to artificially reduce the yields on their underlying bond issues – the IRS

27  promulgated regulations meant to ensure that Government Entities were purchasing Municipal

28  Derivatives at a fair market value price.

80.    IRS tax-exempt bond regulations (here, "Treasury Regulations") stipulate that if Government Entities invest the proceeds of bond sales, the yield of the investment cannot exceed the yield of the municipal bond itself.  Any interest exceeding the bond rate of the tax-exempt bond investments is required to be rebated to the IRS, absent an exception.

81.    To satisfy these so-called arbitrage rules, any given GIC is structured to limit the rate of interest that a municipality can earn on the GIC to less than the yield of the bond whose issuance financed the investment in the GIC in the first place.  The Rate of Return any particular Municipal Derivatives Seller can offer a Government Entity is therefore effectively capped.

82.    Treasury Regulations related to Municipal Derivatives are aimed at ensuring that Government Entities get competitive bids on the interest rate a Municipal Derivatives Seller pays the municipalities under the terms of the GIC.  According to Treasury Regulations, a GIC is sold at "fair market value" if the bidding process satisfies certain procedures.  Essentially, there should be at least three reasonably competitive bids solicited from Municipal Derivatives Sellers, and all of these bidders must have an equal opportunity to bid – that is, no bidder can have a "last look" to review other bids before bidding on the contract.  Treasury Regulations state that a "reasonably competitive" Municipal Derivatives Seller is an entity with "an established industry reputation" as a competitive Municipal Derivatives Seller.  The IRS may levy penalties under Section 6700 of the tax code when it determines bid-rigging has occurred.

83.    The Municipal Derivatives Broker, acting as the fiduciary to the Government Entity, oversees the solicitation and placement of the bids from Municipal Derivatives Sellers.

84.    After hiring a Municipal Derivatives Broker to oversee the solicitation of GIC Bids, Government Entities buy a GIC from a Municipal Derivatives Seller pursuant to the Competitive Bidding Process.

85.     The parties to a GIC are the Municipal Derivatives Seller, acting as the Counterparty and the Government Entity.  The Municipal Derivatives Seller now acting as the Counterparty supplies the most salient term, namely the Rate of Return on the investment.

86.     The GIC entitles the Government Entity to receive the return of the Government Entity's initial principal plus guaranteed interest at a specified Rate of Return, and to withdraw principal from the GIC as permitted.

87.     Generally, a Government Entity will acquire a GIC in order to invest funds on deposit in a debt service reserve fund or construction fund until it needs to use such funds to service debt or fund the payment of project expenses in accordance with the underlying bond documents.

88.     In exchange for the payment of a guaranteed Rate of Return to the Government Entity, and the full repayment of all principal on a date certain, the Municipal Derivatives Counterparty is allowed to invest the principal furnished by the Government Entity. The Municipal Derivatives Counterparty's profits are made on the spread between the Rate of Return the Municipal Derivatives Counterparty offers to the Government Entity and the returns the GIC's invested principal makes for the Municipal Derivatives Counterparty pursuant to whatever investment the Municipal Derivatives Counterparty chooses.

89.     The Competitive Bidding Process outlined in the Treasury Regulations mandates that any Government Entity seeking to buy a GIC receive at least three bona fide Bids from Municipal Derivatives Sellers.  Each bidder typically faxes its Bid into the Municipal Derivatives Broker, which collects the ostensibly competitive Bids and informs the Government Entity of the range of Bids, the identity of the Municipal Derivatives Sellers submitting them, and the time each Bid was received.

90.     Each GIC Bid includes a statement that the Bid was determined without regard to any other formal or informal agreement with another Municipal Derivatives Seller, and that the Bid was not submitted solely as a so-called "courtesy" Bid.

91.     The Municipal Derivatives Seller that offers the highest-yielding Rate of Return is selected as the Counterparty, often within hours of the close of the Competitive Bidding Process.

92.     The vast majority of GICs purchased in the United States are purchased pursuant to the competitive bidding process established by Treasury Regulation §1.148-5 *et seq.*, which has been in effect since approximately 1993, and which are only some of the Treasury Regulations governing the reinvestment of municipal bond proceeds.

93.     The entire GIC bidding and purchasing process, as well as those processes relating to the purchase of other types of Municipal Derivatives, is susceptible to abuse even when dealings involve sophisticated and experienced Government Entities.

94.     Even sophisticated Government Entities (who rely in large part on the Municipal Derivatives Broker Defendants acting as their fiduciaries) may not know that they are the target of the bid-rigging and customer allocation conspiracy alleged herein.

## The Bid-Rigging Conspiracy

95.     The potential for bid-rigging in any given GIC transaction exists in the exploitation of the Rate of Return that a particular GIC Seller is willing to offer to a Government Entity looking to invest its bond proceeds.  The Municipal Derivatives Seller Defendants, aided by the Municipal Derivatives Broker Defendants, have turned the Treasury Regulations into a travesty by exploiting Government Entities' need for reinvestment of bond proceeds.

96.     The Municipal Derivatives Seller Defendants, in concert with the Municipal Derivative Brokers, similarly exploited the elements of other types of Municipal Derivatives bought by Government Entities as part of their bid-rigging and customer allocation conspiracy.

97.     Bid-rigging of GIC transactions, which are illustrative of anticompetitive conduct in the overall market for Municipal Derivatives, typically occurs when only one firm submits a reasonable, financially viable Bid, and the other two or more bidders submit Bids offering unjustifiably low Rates of Return, or simply refuse (or "pass") on the opportunity to bid.

98.     Other times, bids are late or incomplete, leaving only one viable bid for the Government Entity to choose from.

99.     Although at least one market participant has recently attempted to add transparency to the market by developing a web-based bid auction service, GIC Bids are traditionally done over the phone or sent to Municipal Derivatives Brokers via fax, facilitating collusion of the type alleged herein.

100.    At least one investment bank has provided the government with transcripts of telephone conversations that indicated that the investment bank and other market participants were involved in anticompetitive conduct on Municipal Derivatives sold to Government Entities.

101.    While the winning bid may be financially viable in light of the Treasury Regulations' restrictions on bond issue reinvestment, it is not necessarily at fair market value, and does not necessarily provide the Government Entity with the best possible Rate of Return on the investment it is seeking by buying the GIC.

102.    The unrealistically low bids – dubbed "courtesy bids" because they are provided solely as a courtesy so that another Municipal Derivatives Seller can win on a bid that is below fair market value – are often more than 100 basis points below the winning bid.  As Mark Scott, director of the IRS tax exempt bond office, stated in *The Bond Buyer* on January 6, 2005, "When a bid is 100 to 150 basis points below the market and there is no justification for that being so low, one of the assumption you can draw is that there are courtesy bids being provided."

103.    Often the winning bid is the only one high enough to make the GIC work and be a worthwhile reinvestment vehicle for the Government Entity.

104.    According to a speaker at a recent teleconference organized by the National Association of Bond Lawyers and reported in *The Bond Buyer* on February 8, 2007, the use of courtesy bids in GICs transactions is quite prevalent.  IRS officials have stated that bid-rigging is a wide and pervasive practice in GIC transactions and have uncovered numerous transactions involving rigged bids and customer allocation.  A number of these transactions involve both the Municipal Derivatives Seller Defendants and the Municipal Derivatives Broker Defendants.

105.    Municipal Derivatives Brokers also routinely offer favored Municipal Derivatives Sellers with an illegal "last look" at their competitors' submitted bids, or even exclude potential bidders without the Government Entity's knowledge.

106.    Evidence seized by the federal government as part of its wide-ranging investigation, including taped telephone conversations, revealed instances in which the winning bidder was given a "last look" at other bids, or bidders were asked to bid low in exchange for preferential treatment in later deals.

107.    As part of its ongoing investigation into these practices, the IRS also uncovered several bidding schemes that allowed the Municipal Derivatives Seller to underpay for the GIC – that is, provide a less than fair market value interest rate – and then overpay the Municipal Derivatives Broker for other investment agreements or remarketing fees associated with the GIC, a form of kickback that may jeopardize the tax-exempt status of the underlying bond or result in excess "arbitrage" paid to the federal government.

## Governmental Investigations of Defendants' Conspiracies

108.    On Wednesday, November 15, 2006, the FBI began a series of nationwide raids on numerous Municipal Derivatives Brokers, including the Municipal Derivatives Broker Defendants. The FBI raids coincided with the service of nearly two dozen subpoenas on other participants in the Municipal Derivatives business, including the Municipal Derivatives Sellers named as Defendants herein.

109.    The DOJ's Antitrust Division served subpoenas from a grand jury sitting in the Southern District of New York, and a number of the targeted companies revealed that they had also received subpoenas from the Securities and Exchange Commission in connection with a parallel civil probe.

110.    The Antitrust Division is conducting a criminal probe into anticompetitive conduct, including bid-rigging and customer allocation, and the DOJ is contemplating charging market participants with continuing acts of conspiracy, and (as detailed above) have targeted a number of individuals for indictment.

111.    The SEC probe, entitled *In the Matter of Certain GIC Brokers*, is focused on securities fraud in municipal bond deals undertaken since 2000.  Upon information and belief, the SEC is investigating Municipal Derivatives Sellers' non-disclosure of an extensive scheme involving kickbacks to Municipal Derivatives Brokers, a scheme that acted as a necessary corollary to the conspiracy alleged herein.  Such non-disclosure of kickbacks to Municipal Derivatives Brokers jeopardizes the tax-exempt status of Government Entities' bonds, or may subject them to potentially excessive arbitrage payments to the federal government.

112.    The DOJ and SEC investigations follow a lengthy and continuing probe by the IRS' Criminal Investigation Division and its Tax-Exempt Bond office.

113.    The Justice Department subpoenas asked for documents, e-mails, tapes or notes of phone conversations and other information regarding "contracts involving the investment or reinvestment of the proceeds of tax-exempt bond issues and qualified zone academy bonds [as well as] related transactions involving the management or transferal of the interest rate risk associated with those bonds, including but not limited to [GICs], forward supply, purchase or delivery agreements; repurchase agreements; swaps; options; and swaptions."

114.    The subpoenas also demanded organizational charts, phone directories, and lists of all employees involved with Municipal Derivatives, in addition to all documents associated with what the subpoenas apparently described as "relevant municipal contracts awarded or intended to be awarded pursuant to competitive bidding," which would include invitations to bid; solicitations, notices or RFPs issued to any provider by municipal clients; actual or proposed responses to those RFPs; and amounts and prices bid for the various investment vehicles.

115.    On February 9, 2007, Defendant Bank of America announced that it entered into a leniency agreement with the Justice Department in connection with what it described as "the Department's investigation into anticompetitive practices in the municipal derivatives industry."

116.    Defendant Bank of America noted that the amnesty grant "was the result of the company voluntarily providing information to the Department before the Department began its investigation, as well as the company's continuing cooperation."

117.    Entry into the DOJ's amnesty program follows presentation of evidence of a *per se* antitrust violation on behalf of the applicant, in this instance Defendant Bank of America. Evidence of Defendant Bank of America's dealings, including recorded telephone conversations of traders giving courtesy bids, was one of the key galvanizers of the criminal investigation. Key derivatives officials at the bank were placed on "administrative leave," including Dean Pinard, the head of BOA's derivatives department.

118.    Defendant Bank of America also disclosed that it had reached a $14.7 million settlement with the IRS relating to the company's role in providing GICs and other agreements to municipal bond issuers.

119.    As detailed in Paragraphs 16 to 53 above, a number of individuals have been targeted for indictment by the Department of Justice, and a number of Municipal Derivatives Seller Defendants are facing civil and administrative actions from the SEC in relation to that agency's investigation into anticompetitive practices in the Municipal Derivatives market.

## FRAUDULENT CONCEALMENT

120.    Oakland and members of the Class had no knowledge of the agreement, contract, combination, and conspiracy alleged in this Complaint, or of any facts that might have led to the discovery thereof, until shortly before the filing of this action. Oakland could not have discovered the agreement, contract, combination, and conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and methods of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their agreement, contract, combination, and conspiracy. These methods of secrecy included, but were not limited to, secret meetings, misrepresentations concerning the reasons for price increases, encouraging witnesses to give false testimony to the grand jury and government officials, and destroying or concealing evidence of their illegal conduct.

1     121.    The affirmative acts of the Defendants alleged herein, including acts in

2  furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

3  precluded detection.

4     122.    By their very nature, Defendants' bid-rigging and customer-allocation

5  conspiracy was inherently self-concealing.  The Municipal Derivatives industry is not exempt

6  from antitrust regulation, and thus Oakland reasonably considered it to be a well-regulated

7  competitive industry.

8     123.    In the context of the circumstances surrounding Defendants' pricing

9  practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a

10  reasonable person that defendants' bidding and pricing were conspiratorial.  Accordingly, a

11  reasonable person under the circumstances would not have been alerted to investigate the

12  legitimacy of Defendants' proffered Municipal Derivatives prices.

13     124.    Oakland and members of the Class could not have discovered the alleged

14  contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence

15  because of the deceptive practices and techniques of secrecy employed by Defendants and their

16  co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination or

17  conspiracy.  Such practices are especially prevalent in bid-rigging and customer-allocation

18  conspiracies such as the one alleged herein.

19     125.    Because the alleged conspiracy was both self-concealing and affirmatively

20  concealed by Defendants and their co-conspirators, Oakland and members of the Class had no

21  knowledge of the alleged conspiracy, or of any facts or information that would have caused a

22  reasonably diligent person to investigate whether a conspiracy existed.

23     126.    As a result of Defendants' fraudulent concealment of their conspiracy, the

24  running of any statute of limitations has been tolled with respect to any claims that Oakland and

25  members of the Class have alleged in this Complaint.

26     127.    Throughout the Class Period, Defendants and their co-conspirators

27  affirmatively and fraudulently concealed their unlawful conduct.

28

128.    Oakland and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until before this litigation was commenced because Defendants and their co-conspirators used and continue to use deceptive and secret methods to avoid detection and to affirmatively conceal their violations.  Nor could Oakland or the Class members have discovered the violations earlier than that time because Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

129.    Defendants and their co-conspirators engaged in a successful anticompetitive conspiracy concerning Municipal Derivatives, which they affirmatively concealed, at least in the following respects:

a.    By meeting secretly to discuss effective prices, bids, and customers and markets of Municipal Derivatives in the U.S.;

b.    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

c.    By intentionally creating the false appearance of competition by staging sham auctions in which the results were pre-determined; and

d.    By furnishing each other participant in all given bidding sessions with illegal "last looks" at their ostensible competitors' bids.

130.    Oakland and Class members did not know, and could not have discovered through reasonable diligence, that the auctions arranged by the Derivatives Broker Defendants were sham, and that rather than being competitive, the results of the auctions were rigged.

131.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Oakland's and the Class' claims have been tolled.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**(Violation of Section 1 of the Sherman Act)**

132.    From as early as January 1, 1992 through the present, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Municipal Derivatives in the United States in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

133.    The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially supracompetitive prices for Municipal Derivatives and to rig bids and to allocate customers and markets for Municipal Derivatives in the United States.

134.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

a.    participating in meetings and conversations among themselves during which they agreed to price Municipal Derivatives at certain levels, and otherwise to fix, increase, maintain or stabilize effective prices paid by Oakland and members of the Class with respect to Municipal Derivatives sold in the United States and to rig bids and allocate customers and markets of Municipal Derivatives;

b.    arranging sham auctions among the Municipal Derivatives Seller Defendants that were designed to create the appearance of competition for the sale of Municipal Derivatives, but in which the result had been agreed upon among the Defendants and co-conspirators;

c.    allocating customers and markets for Municipal Derivatives in the United States in furtherance of their agreements;

d.    rigging bids for Municipal Derivatives sold in the United States; and

e.    participating in meetings and conversations among themselves to implement, adhere and police the agreements they reached.

135.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease or stabilize prices and to allocate customers and markets with respect to Municipal Derivatives.

136.    The Defendants' unlawful contract, combination or conspiracy has had at least the following effects:

a.    Effective prices paid by Oakland and the members of the Class with respect to Municipal Derivatives were fixed, stabilized and maintained at artificially low and non-competitive levels in the United States;

b.    Bids for Municipal Derivatives sold in the United States were rigged;

c.    Customers and markets for Municipal Derivatives were allocated among Defendants and their co-conspirators;

d.    Oakland and the other members of the Class paid more or received lower Rates of Return for the Municipal Derivatives they purchased than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful activities;

e.    Price competition with respect to the sale of Municipal Derivatives was restrained, suppressed and eliminated in the United States; and

f.    As a direct and proximate result of the illegal combination, contract or conspiracy, Oakland and the members of the Class have been injured and financially damaged in their businesses and property, in amounts to be determined, by being deprived of the highest-allowable interest rate on its Municipal Derivatives investment.  The courtesy (sometimes also called complimentary) bids submitted by the Municipal Derivatives Sellers defrauded the Government Entities by creating the appearance of competition to conceal the secretly deflated interest rate offers.

1

**SECOND CLAIM FOR RELIEF**
**(Violation of the California Cartwright Act, Cal. Bus. & Prof. Code section 16720, *et seq.*)**

2

3        137.    Oakland, on behalf of itself and all others similarly situated, realleges and

4    incorporates, as if fully alleged herein, each of the allegations contained in the preceding

5    paragraphs of this Complaint, and further alleges against Defendants as follows.

6        138.    The unlawful conduct of Defendants, including the Defendants

7    headquartered or based in California, was centered in and carried out within California, and

8    Defendants' conduct within California injured all members of the Class throughout the United

9    States.  Therefore, this claim for relief under California law is brought on behalf of all members

10   of the Class, whether or not they are California residents.

11       139.    Beginning at least as early as January 1, 1992 through the present, the exact

12   dates being unknown to Oakland, Defendants and various co-conspirators entered into and

13   engaged in a continuing unlawful trust in restraint of the trade and commerce described above in

14   violation of Section 16720, California Business and Professional Code. Defendants, and each of

15   them, have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of,

16   allocate markets and rig bids for, Municipal Derivatives.

17       140.    For the purpose of forming and implementing the alleged combinations,

18   trusts, agreements, understandings and concert of action, Defendants and their co-conspirators did

19   those things they conspired to do, including but not limited to the acts alleged above, including

20   actions:

21               a.    to fix, raise, maintain and stabilize the price of Municipal

22   Derivatives;

23               b.    to allocate markets for Municipal Derivatives amongst themselves;

24   and

25               c.    to submit rigged bids for Municipal Derivatives.

26       141.    In formulating and carrying out the alleged combinations, trusts,

27   agreements, understandings and concert of action, Defendants and their co-conspirators engaged

28   in anticompetitive activities, the purpose and effect of which were (a) to artificially raise, fix,

1    maintain, or stabilize the prices of Municipal Derivatives; (b) to allocate among themselves

2    Municipal Derivatives markets and customers; and (c) to facilitate, effectuate, and implement the

3    contract, combination, and conspiracy.

4         142.    The combination and conspiracy alleged herein has had the following

5    effects, among others:

6              a.    Price competition in the sale of Municipal Derivatives has been

7    restrained, suppressed and/or eliminated in the State of California and throughout the United

8    States;

9              b.    Prices for Municipal Derivatives sold by Defendants and their

10   co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-

11   competitive levels in the State of California and throughout the United States; and

12             c.    Those who purchased Municipal Derivatives from Defendants and

13   their co-conspirators have been deprived of the benefit of free and open competition.

14        143.    As a direct and proximate result of the illegal combination, trust,

15   agreement, understanding and concert of action, Oakland and the members of the Class have been

16   injured in their business and property in that they paid more for Municipal Derivatives than they

17   otherwise would have paid in the absence of Defendants' unlawful conduct.

18        144.    As a result of Defendants' violation of Section 16720 of the California

19   Business and Professions Code, Oakland seeks treble damages and the costs of suit, including

20   reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and

21   Professions Code.

22                   **THIRD CLAIM FOR RELIEF**
                **(Violation of the California Unfair Competition Law,**
23              **Cal. Bus. & Prof. Code section 17200, *et seq*.)**

24        145.    Oakland, on behalf of itself and all others similarly situated, realleges and

25   incorporates, as if fully alleged herein, each of the allegations contained in the preceding

26   paragraphs of this Complaint, and further alleges against Defendants as follows.

27        146.    Defendants' unlawful conduct was centered in, carried out and perfected

28   mainly within the State of California, and Defendants' conduct within California injured all

1  members of the Class throughout the United States.  Therefore, this claim for relief under

2  California law is brought on behalf of all members of the Class, whether or not they are

3  California residents.

4      147.  Beginning at least as early as January 1, 1992 and continuing to the

5  present, the exact dates being unknown to Oakland, Defendants committed acts of unfair

6  competition, as defined by Sections 17200, *et seq*. of the California Business and Professions

7  Code, commonly known as the Unfair Competition Law, by engaging in the acts and practices

8  specified above.

9      148.  Oakland and the members of the Class bring this claim pursuant to

10  Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution

11  and/or disgorgement from these Defendants for acts, as alleged herein, that violate the Unfair

12  Competition Law.

13      149.  Defendants' acts, omissions, misrepresentations, practices and non-

14  disclosures, as alleged herein, constitute a common course of conduct of unfair competition by

15  means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of

16  California Business and Professions Code, Section 17200, *et seq*., in that, for example:

17      a.  the violations of Section 16720, *et seq*., of the California Business

18  and Professions Code, set forth above;

19      b.  the acts described above violate the Sherman Act, 15 U.S.C. § 1;

20      c.  Defendants' acts, omissions, misrepresentations, practices and

21  nondisclosures, as described above, whether or not in violation of Section 16720, *et seq*. of the

22  California Business and Professions Code, and whether or not concerted or independent acts, are

23  otherwise unfair, unconscionable, unlawful or fraudulent;

24      d.  Defendants' act and practices are unfair to consumers of Municipal

25  Derivatives in the State of California and throughout the United States, within the meaning of

26  Section 17200, California Business and Professions Code; and

27      e.  Defendants' acts and practices are fraudulent or deceptive within

28  the meaning of Section 17200 of the California Business and Professions Code.

150.    Oakland and each of the Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business acts or practices.

151.    The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused Oakland and the members of the Class to pay supra-competitive and artificially-inflated prices for Municipal Derivatives.  Oakland and the members of the class suffered injury in fact and lost money or property as a result of such unfair competition.

152.    The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

153.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Oakland and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays for relief as follows:

1.    That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Oakland be certified as a class representative and Oakland's counsel be appointed as counsel for the Class;

2.    That the unlawful contract, combination or conspiracy alleged be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act and Section 16720, *et seq.*, of the California Business & Professions Code (the Cartwright Act);

3.    That the unlawful contract, combination or conspiracy alleged be adjudged and decreed to be unfair, fraudulent, and illegal in violation of Section 17200, *et seq.*, of the California Business & Professions Code (the Unfair Competition Law);

1               4.      That Oakland and the Class recover damages and restitution, as provided

2  by law, determined to have been sustained as to each of them, in an amount to be trebled in

3  accordance with the antitrust laws, and that judgment be entered against defendants on behalf of

4  Oakland and of the Class;

5               5.      That Oakland and the Class recover their costs of the suit, including

6  attorneys' fees, as provided by law; and

7               6.      For such other and further relief as is just under the circumstances.

8  //

9  //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

1

## **DEMAND FOR JURY TRIAL**

2          Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

3     a jury trial as to all issues triable by a jury.

4

5     Dated: April __, 2008                          By:_____
                                                              John A. Russo
6

7                                                    John A. Russo, City Attorney (SBN 063203)
                                                     *jrusso@oaklandcityattorney.org*
8                                                    Barbara Parker, Chief Asst. City Attorney (SBN 069722)
                                                     *bparker@oaklandcityattorney.org*
9                                                    Mark Morodomi, Supervising Deputy City Attorney
                                                     (SBN 120914)
10                                                   *mmorodomi@oaklandcityattorney.org*
                                                     Kathleen Salem-Boyd, Deputy City Attorney (SBN
11                                                   100179)
                                                     *ksalemboyd@oaklandcityattorney.org*
12                                                   CITY OF OAKLAND
                                                     One Frank H. Ogawa Plaza, 6th Floor
13                                                   Oakland, California 94612
                                                     Telephone:  (510) 238-3034
14                                                   Facsimile:  (510) 238-6500

15                                                   Richard M. Heimann (SBN 63607)
                                                     *rheimann@lchb.com*
16                                                   Joseph R. Saveri (SBN 130064)
                                                     *jsaveri@lchb.com*
17                                                   Eric B. Fastiff (SBN 182260)
                                                     *efastiff@lchb.com*
18                                                   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                                     275 Battery Street, 30th Floor
19                                                   San Francisco, CA  94111
                                                     Telephone:      (415) 956-1000
20                                                   Facsimile:      (415) 956-1008

21                                                   James A. Quadra (SBN 131084)
                                                     *quadra@meqlaw.com*
22                                                   Sylvia Sokol (SBN 200126)
                                                     *sokol@meqlaw.com*
23                                                   MOSCONE, EMBLIDGE & QUADRA, LLP
                                                     220 Montgomery Street
24                                                   Mills Tower, Suite 2100
                                                     San Francisco, CA 94104
25                                                   Telephone:      (415) 362-3599
                                                     Facsimile:      (415) 362-2006

26

27

28

1                Steven E. Fineman (SBN 140335)
              *sfineman@lchb.com*

2                Daniel E. Seltz
              *dseltz@lchb.com*

3                LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
              780 Third Avenue, 48th Floor

4                New York, NY  10017
              Telephone:    (212) 355-9500

5                Facsimile:    (212) 355-9592

6                *Attorneys for Individual and Representative Plaintiff*
              *City of Oakland, California*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

756814.3                          - 42 -                    CLASS ACTION COMPLAINT