**CT**
a Wolters Kluwer business

CT
111 Eighth Avenue
New York, NY 10011

212 894 8940 tel
212 590 9180 fax
www.ctlegalsolutions.com

May 29, 2008

Richard W. Wieking, Clerk
United States District Court
Northern District of California
450 Golden Gate Avenue
16th Floor
San Francisco, CA  94102

RE:    TRINITY FUNDING COMPANY, LLC  (NY)

Title of Action: City of Oakland, Califorrnai, Pltf. vs. AIG Financial Products Corp., et al.
including Trinity Funding Company, LLC, Dfts. Case # CV082116

Dear Sir:

We are returning documents served/received for the above company by our New York
office.

According to our records our statutory representation services were discontinued and all
processes sent to the last known address on our records was returned as undeliverable.

Since we do not have any other addresses in our files to which we can forward the papers,
we are returning them to you and filing resignation of agent in all states where permitted.

Please understand that we take no position as to the validity of the service. We are merely
stating that after reasonable efforts, we do not have any address to which to forward
the papers.

Very truly yours,

*A. Coleman*
SOP Support

Eric B. Fastiff, Attorney
Lieff, Cabraser, Heimann & Bernstein, LLP
275 Battery Street
30th Floor
San Francisco, CA  94111

**ORIGINAL**

AO 440 (Rev 03/08) Civil Summons

# UNITED STATES DISTRICT COURT
for the

Northern District of California

| | | |
|---|---|---|
| CITY OF OAKLAND, CALIFORNIA | ) | **CV 08    2116** |
| Plaintiff | ) | |
| v. | ) | Civil Action No. |
| AIG FINANCIAL PRODUCTS CORP., et al. | ) | |
| Defendant | ) | |

**Summons in a Civil Action**

**MEJ**

To:    (see attached list)

_(Defendant's name)_

A lawsuit has been filed against you.

Within  20  days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, whose name and address are:

Eric B. Fastiff
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111

If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Richard W. Wieking
Name of clerk of court

Date:    APR 2 3 2008

Helen L. Almacen
Deputy clerk's signature

_(Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States allowed 60 days by Rule 12(a)(3).)_

AO 440 (Rev. 03/08) Civil Summons (Page 2)

## Proof of Service

I declare under penalty of perjury that I served the summons and complaint in this case on _____,
by:

(1) personally delivering a copy of each to the individual at this place, _____; or

(2) leaving a copy of each at the individual's dwelling or usual place of abode with _____
who resides there and is of suitable age and discretion; or

(3) delivering a copy of each to an agent authorized by appointment or by law to receive it whose name is
_____; or

(4) returning the summons unexecuted to the court clerk on _____.

My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00        .

Date: _____

_____
Server's signature

_____
Printed name and title

_____
Server's address

## ATTACHMENT TO
### SUMMONS

### *Defendants To Be Served:*

AIG FINANCIAL PRODUCTS CORP.
AIG SUNAMERICA LIFE ASSURANCE CO.
BANK OF AMERICA CORPORATION
BANK OF AMERICA, N.A.
BEAR STEARNS COMPANIES, INC.
CAIN BROTHERS & COMPANY, LLC
CDR FINANCIAL PRODUCTS, INC.
FELD WINTERS FINANCIAL, LLC
FINANCIAL GUARANTY INSURANCE CO.
FINANCIAL SECURITY ASSURANCE HOLDINGS, LTD.
FIRST SOUTHWEST COMPANY
GE FUNDING CAPITAL MARKET SERVICES, INC.
GENWORTH FINANCIAL, INC.
GEORGE K. BAUM & COMPANY
INVESTMENT MANAGEMENT ADVISORY GROUP, INC.
J.P. MORGAN CHASE & CO.
KINSELL NEWCOMB & DE DIOS, INC.
LEHMAN BROTHERS INC.
MERRILL LYNCH & CO. INC.
MORGAN KEEGAN & CO., INC.
MORGAN STANLEY
NATIONAL WESTMINSTER BANK plc
NATIXIS, S.A.
PACKERKISS SECURITIES, INC.
PIPER JAFFRAY & CO.
SECURITY CAPITAL ASSURANCE, INC.
SHOCKLEY FINANCIAL CORP.
SOCIÉTÉ GÉNÉRALE
SOUND CAPITAL MANAGEMENT, INC.
TRINITY FUNDING COMPANY, LLC
UBS AG
WACHOVIA BANK, N.A.
WACHOVIA CORPORATION
WINTERS & CO. ADVISORS, LLC
XL ASSET FUNDING COMPANY I LLC
XL CAPITAL, LTD.
XL LIFE INSURANCE & ANNUITY COMPANY

COPY

1    John A. Russo, City Attorney (SBN 063209)
     *jrusso@oaklandcityattorney.org*
2    Barbara Parker, Chief Asst. City Attorney (SBN 069722)
     *bparker@oaklandcityattorney.org*
3    Mark Morodomi, Supervising Deputy City Attorney (SBN 120914)
     *mmorodomi@oaklandcityattorney.org*
4    Kathleen Salem-Boyd, Deputy City Attorney (SBN 100179)
     *ksalemboyd@oaklandcityattorney.org*
5    CITY OF OAKLAND, CALIFORNIA
     One Frank H. Ogawa Plaza, 6th Floor
6    Oakland, California 94612
     Telephone:    (510) 238-3034
7    Facsimile:     (510) 238-6500

8    Richard M. Heimann (SBN 63607)
     *rheimann@lchb.com*
9    Joseph R. Saveri (SBN 130064)
     *jsaveri@lchb.com*
10   Eric B. Fastiff (SBN 182260)
     *efastiff@lchb.com*
11   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
     275 Battery Street, 30th Floor
12   San Francisco, California 94111
     Telephone:    (415) 956-1000
13   Facsimile:     (415) 956-1008

14   James A. Quadra (SBN 131084)
     *quadra@meqlaw.com*
15   Sylvia Sokol (SBN 200126)
     *sokol@meqlaw.com*
16   MOSCONE, EMBLIDGE & QUADRA, LLP
     220 Montgomery Street
17   Mills Tower, Suite 2100
     San Francisco, California 94104
18   Telephone:    (415) 362-3599
     Facsimile:     (415) 362-2006
19

*Attorneys for Individual and Representative Plaintiff*
20   *City of Oakland, California*

ORIGINAL FILED

APR 2 3 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

MEJ

CV 08    2116

21              UNITED STATES DISTRICT COURT

22          NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 23   CITY OF OAKLAND, CALIFORNIA, a Municipal Corporation, on behalf of itself and all others 24   similarly situated,<br><br>25           Plaintiff,<br><br>26       v.<br><br>27   AIG FINANCIAL PRODUCTS CORP.; AIG SUNAMERICA LIFE ASSURANCE CO.; BANK 28   *(caption continued on next page)* | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE SHERMAN ACT, THE CARTWRIGHT ACT, AND THE UNFAIR COMPETITION LAW**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

756814.3                                         CLASS ACTION COMPLAINT

1 (typically used for capital projects and subject to provisions allowing investment principal to be

2 drawn down pursuant to a set schedule). A GIC is similar to a bond, in that "principal" – the

3 proceeds of a municipal bond issue – is invested in exchange for payment of a certain fixed Rate

4 of Return determined by the terms of the contract.

5         b.     Advance Refunding Escrow: An "advance refunding escrow" is an

6 arrangement by which the proceeds of a refunding issue (a bond issued to refund an outstanding

7 bond) are deposited into an escrow account for investment in an amount sufficient to pay the

8 principal of, and interest on, the underlying issue to be refunded on the original interest payment

9 and maturity dates.

10         c.     Swap: A "swap" is a type of agreement frequently used to

11 minimize the interest rate risk Government Entities face when issuing large amounts of tax-

12 exempt debt obligations. A swap involves two Counterparties – the Government Entity and a

13 Municipal Derivatives Seller – and is essentially the sale of an instrument and the simultaneous

14 purchase of another instrument for purposes of enhancing the Counterparties' respective holdings.

15 Government Entities use swaps to achieve desired tax results, or to alter or protect various

16 features of an existing municipal bond portfolio. There are several types of swaps: (a) floating-

17 for-fixed interest swap; (b) fixed-for-floating interest swap; and (c) floating-for-floating (basis-

18 rate) swap, where the two are based on different indices (typically the LIBOR or BMA indices).

19 Government Entities, even those with sophisticated and experienced municipal finance

20 departments, retain a Municipal Derivatives Broker (including many of those named as

21 Defendants herein) as "swap advisors" to aid in the swap transaction.

22         d.     Option: An "option" is one of two types of agreements used to

23 shift a Government Entity's tax-exempt securities holdings typically acquired in association with

24 issuance of municipal bonds.

25         i.     A Put Option is a provision in a bond contract where the

26 investor has the right, on specified dates after required notification, to surrender the securities to

27 the issuer or the issuer's agent at the predetermined price (usually par value).

28

1          ii.    A Call Option is a transaction where the issuer repays to the

2    holder of an outstanding security the principal amount thereof (plus, in certain cases, an

3    additional amount representing a redemption premium) as a result of the issuer exercising a right

4    under the bond contract to repay the security prior to its scheduled maturity date (often referred to

5    as the "call").

6          c.    Swaption:  A "Swaption" is the combination of a Swap and an

7    Option.

8          f.    Interest Rate Floors and Collars:  Interest rate "floors" and "collars"

9    are agreements in which a Government Entity agrees with a Municipal Derivatives Seller (the

10   Counterparty) to pay fixed rates of interest on an investment of variable-rate debt, either agreeing

11   to pay the Counterparty an interest rate at or above a specified rate (a "floor") or no more or less

12   than a particular interest rate within range of interest rates (a "collar").

13         12.    Municipal Derivatives Broker: As used herein, the term "Derivatives

14   Broker" means an entity retained by a Government Entity to oversee the processes, including the

15   Competitive Bidding Process, pursuant to which Municipal Derivatives are purchased.

16   Derivatives Brokers act as fiduciaries of a Government Entity seeking to purchase Municipal

17   Derivatives, often acting as swap advisors in addition to overseeing the competitive bidding

18   undertaken by the Government Entity for those Municipal Derivatives sold through ostensibly

19   competitive means.  Derivatives Brokers enjoy mutually symbiotic and incestuous relationships

20   with large investment banks and insurance companies, and act as "finders" of municipal securities

21   business for the securities dealers or investment banks that often pay kickbacks to the Municipal

22   Derivatives Brokers in the form of finders' fees and monthly retainers.

23         13.    Municipal Derivatives Counterparty: As used herein, the term "Municipal

24   Derivatives Counterparty" or "Counterparty" means a Municipal Derivatives Seller with whom a

25   Government Entity contracts for a transaction involving the purchase of one or more of the

26   Municipal Derivatives described herein.

27

28

756814.3                              - 5 -                    CLASS ACTION COMPLAINT

1    investigation into wrongdoing associated with municipal bond derivatives transactions in

2    Jefferson County, Alabama.

3          22.    Defendant Financial Guaranty Insurance Co. ("FGIC") is a Delaware

4    corporation maintaining its principal place of business in New York, New York. During the

5    Class Period, FGIC, a former affiliate of General Electric, issued and sold Municipal Derivatives

6    to Oakland and/or members of the Class in the United States.

7          a.    FGIC has received a subpoena from the Securities and Exchange

8    Commission in connection with the SEC's investigation into anticompetitive practices in the

9    Municipal Derivatives industry.

10         23.    Defendant Financial Security Assurance Holdings, Ltd. ("FSA Holdings")

11   is a New York corporation maintaining its principal place of business in New York, New York.

12   During the Class Period, FSA Holdings issued and sold Municipal Derivatives to Oakland and/or

13   members of the Class in the United States, either directly or through its wholly-owned subsidiary

14   FSA Capital Management Services, LLC, ("FSA Capital"), a Delaware limited liability company

15   headquartered in New York City.

16         a.    In November, 2006 FSA Holdings received subpoenas from the

17   Antitrust Division of the United States Department of Justice and the Securities and Exchange

18   Commission in connection with those agencies' investigations into anticompetitive conduct in the

19   Municipal Derivatives business.

20         b.    On February 4, 2008, FSA Holdings received a so-called Wells

21   notice from the Philadelphia regional office of the SEC, informing the company that the SEC

22   staff had recommended civil or administrative action against FSA Holdings in connection with its

23   investigation into anticompetitive practices in the Municipal Derivatives industry. The Wells

24   notice issued to FSA Holdings related to alleged violations of Section 10(b) of the Securities

25   Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

26         24.    Defendant First Southwest Company ("First Southwest") is a Delaware

27   corporation with its principal place of business in Dallas, Texas. During the Class Period, First

28

1  Southwest issued and sold Municipal Derivatives to Oakland and/or members of the Class in the

2  United States.

3         a.    First Southwest has received a subpoena from the Securities and

4  Exchange Commission in connection with the SEC's investigation into anticompetitive practices

5  in the Municipal Derivatives industry.

6         25.    Defendant Genworth Financial, Inc. ("Genworth") is a New York

7  corporation maintaining its principal place of business at Fairfield, Connecticut.  Genworth issued

8  and sold Municipal Derivatives to Oakland and/or members of the Class in the United States.

9         a.    Genworth has received subpoenas from the Antitrust Division of

10  the United States Department of Justice and the Securities and Exchange Commission in

11  connection with those agencies' investigations into anticompetitive conduct in the Municipal

12  Derivatives business.

13         26.    Defendant GE Funding Capital Market Services, Inc. ("GE Funding") is a

14  Delaware corporation maintaining its principal place of business in New York, New York.  GE

15  Funding is a member of the GE Funding Capital Market Services Group (GE Funding CMS).

16  During the Class Period, GE Funding issued and sold Municipal Derivatives to members of the

17  Class.

18         27.    Defendant JPMorgan Chase & Co. ("JPMorgan") is a Delaware

19  corporation maintaining its principal place of business in New York, New York.  During the

20  Class Period, JPMorgan issued and sold Municipal Derivatives to Oakland and/or members of the

21  Class in the United States.

22         a.    In November, 2006, JPMorgan received subpoenas from the

23  Antitrust Division of the United States Department of Justice and the Securities and Exchange

24  Commission in connection with those agencies' investigations into anticompetitive conduct in the

25  Municipal Derivatives business.

26         b.    At least three former JPMorgan employees are targets of the Justice

27  Department's grand jury investigation into anticompetitive practices in the Municipal Derivatives

28  industry.

756814.3                          - 11 -                    CLASS ACTION COMPLAINT

1        c.     Samuel Gruer, who worked at JPMorgan from 1994 through 2006

2  and whose last position was Vice-President in the Derivatives Marketing unit of the company's

3  Tax-Exempt Capital Markets Group, has recently disclosed that he is a target of the grand jury

4  convened in the Southern District of New York by the Antitrust Division of the Department of

5  Justice investigating antitrust and other violations related to anticompetitive conduct in the

6  Municipal Derivatives business. Target letters of the kind received by Gruer are an indication

7  that the DOJ has substantial evidence of the commission of a federal crime and typically a sign

8  that the recipient will soon be indicted absent a plea agreement or cooperation deal.

9        d.     Shlomi Raz, who worked at JPMorgan from 1992 to 2003, has also

10  recently disclosed that he is a target of the grand jury convened in the Southern District of New

11  York by the Antitrust Division of the Department of Justice investigating antitrust and other

12  violations related to anticompetitive conduct in the Municipal Derivatives business. Target letters

13  of the kind received by Raz are an indication that the DOJ has substantial evidence of the

14  commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

15  plea agreement or cooperation deal.

16        e.     James Hertz, who worked at JPMorgan from 1994 until he was

17  fired from the firm in January, 2008, has also recently disclosed that JPMorgan informed him that

18  he was under investigation by the DOJ for what Hertz described as "conduct on the municipal

19  derivatives marketing desk," an indication that the investigation involves JPMorgan's entire

20  municipal derivatives business, which necessarily includes Municipal Derivatives. Target letters

21  of the kind received by Hertz are an indication that the DOJ has substantial evidence of the

22  commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

23  plea agreement or cooperation deal.

24        28.     Defendant JPMorgan Chase Bank, N.A. ("JPMorgan N.A.") is a national

25  banking association with headquarters in Ohio, and is a subsidiary of JP Morgan Chase. During

26  the Class Period, JPMorgan N.A. issued and sold Municipal Derivatives to Oakland and/or

27  members of the Class in the United States.

28

1       29.    Defendant Kinsell Newcomb & DeDios Inc. ("KND") is a California

2    corporation with its principal place of business in Solano Beach, California. During the Class

3    Period, KND issued and sold Municipal Derivatives to Oakland and/or members of the Class in

4    the United States.

5           a.    KND has received subpoenas from the Antitrust Division of the

6    United States Department of Justice and the Securities and Exchange Commission in connection

7    with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives

8    business.

9       30.    Defendant Lehman Brothers Inc. ("Lehman Brothers") is a Delaware

10    corporation maintaining its principal place of business in New York, New York. During the

11    Class Period, Lehman Brothers issued and sold Municipal Derivatives to members of the Class.

12    Lehman is a wholly-owned subsidiary of Lehman Brothers Holdings Inc.

13       31.    Defendant Merrill Lynch & Co. Inc. ("Merrill Lynch") is a Delaware

14    corporation maintaining its principal place of business in New York, New York. During the

15    Class Period, Merrill Lynch issued and sold Municipal Derivatives to members of the Class.

16       32.    Defendant Morgan Stanley ("Morgan Stanley") is a Delaware corporation

17    maintaining its principal place of business in New York, New York. During the Class Period,

18    Morgan Stanley issued and sold Municipal Derivatives to members of the Class.

19       33.    Defendant National Westminster Bank plc ("NatWest") is a public limited

20    corporation maintaining its principal place of business in London, England. During the Class

21    Period, NatWest issued and sold Municipal Derivatives to members of the Class. NatWest is a

22    subsidiary of Royal Bank of Scotland.

23       34.    Defendant Natixis, S.A. ("Natixis"), formerly known as IXIS Corporate &

24    Investment Bank and CDC Funding Corp., is a foreign corporation maintaining its principal place

25    of business in Paris, France. During the Class Period, Natixis issued and sold Municipal

26    Derivatives to Oakland and/or members of the Class in the United States.

27           a.    In November, 2006, Natixis' predecessor IXIS Corporate &

28    Investment Bank received a subpoena from the Antitrust Division of the United States

756814.3                    - 13 -             CLASS ACTION COMPLAINT

1    Department of Justice in connection with its grand jury investigation into anticompetitive conduct

2    in the Municipal Derivatives business.

3        35.    Defendant Piper Jaffray & Co. ("Piper Jaffray") is a Delaware corporation

4    with its principal place of business in Minneapolis, Minnesota.  During the Class Period, Piper

5    Jaffray issued and sold Municipal Derivatives to Oakland and/or members of the Class in the

6    United States.

7        a.    Piper Jaffray has received subpoenas from the Antitrust Division of

8    the United States Department of Justice and the Securities and Exchange Commission in

9    connection with those agencies' investigations into anticompetitive conduct in the Municipal

10   Derivatives business.

11       b.    James Towne, employed as Managing Director of Piper Jaffray's

12   municipal derivatives group until January, 2008, recently disclosed that Piper Jaffray informed

13   him that he is under investigation by the Antitrust Division of the Department of Justice for

14   potential antitrust and other violations relating to the Municipal Derivatives industry.

15       36.    Defendant Security Capital Assurance, Inc. ("Security Capital") is a

16   foreign corporation maintaining its principal place of business in Hamilton, Bermuda.  During the

17   Class Period, Security Capital, either directly or through its affiliates Defendants XL Capital, Ltd.

18   and XL Asset Funding Company 1 LLC, issued and sold Municipal Derivatives to Oakland

19   and/or members of the Class in the United States.

20       37.    Defendant Société Générale ("SocGen") is a French corporation

21   headquartered in Paris.  During the Class Period, SocGen issued and sold Municipal Derivatives

22   to Oakland and/or members of the Class in the United States, either directly or through its wholly-

23   owned subsidiaries Société Générale Americas, Inc., a Delaware corporation headquartered in

24   New York, New York and/or SG Americas Securities, LLC, a Delaware limited liability

25   corporation also headquartered in New York, New York.

26       a.    SocGen has received a subpoena from the Securities and Exchange

27   Commission in connection with the SEC's investigation into anticompetitive practices in the

28   Municipal Derivatives industry.

756814.3                                - 14 -                        CLASS ACTION COMPLAINT

1                   b.      SocGen's Municipal Derivatives business is being scrutinized by

2  the IRS, which is investigating improper kickbacks to Defendant CDR related to a GIC brokered

3  by CDR.

4             38.     Defendant Trinity Funding Company, LLC ("GE Trinity") is a New York

5  limited liability corporation maintaining its principal place of business in New York, New York.

6  GE Trinity is a member of the GE Funding Capital Market Services Group (GE Funding CMS).

7  During the Class Period, GE Trinity issued and sold Municipal Derivatives to members of the

8  Class.

9             39.     Defendant UBS AG ("UBS") is a Swiss corporation with its headquarters

10  in Basel, Switzerland.  During the Class Period, UBS issued and sold Municipal Derivatives to

11  Oakland and/or members of the Class in the United States, either directly or through its wholly-

12  owned subsidiary, Defendant UBS Securities, LLC ("UBS Securities").

13                 a.      In November, 2006, UBS received subpoenas from the Antitrust

14  Division of the United States Department of Justice and the Securities and Exchange Commission

15  in connection with those agencies' investigations into anticompetitive conduct in the Municipal

16  Derivatives business.

17                 b.      On February 4, 2008, UBS received a so-called Wells notice from

18  the Philadelphia regional office of the SEC advising the company that the SEC staff had

19  recommended that the SEC bring a civil action against UBS in connection with the

20  anticompetitive practices associated with municipal bond derivatives.

21                 c.      Peter Ghavami, until December 2007 the Managing Director and

22  Co-Manager of Municipal Derivatives at UBS Securities in New York and London, recently

23  disclosed that he is a target of the grand jury convened in the Southern District of New York by

24  the Antitrust Division of the Department of Justice investigating antitrust and other violations

25  related to anticompetitive conduct in the Municipal Derivatives business.  Target letters of the

26  kind received by Ghavami are an indication that the DOJ has substantial evidence of the

27  commission of a federal crime and typically a sign that the recipient will soon be indicted absent a

28  plea agreement or cooperation deal.

1        40.    Defendant UBS Securities LLC, formerly known as UBS Warburg LLC, is

2    a Delaware corporation with its principal place of business in New York, New York. It is a

3    subsidiary of UBS AG. During the Class Period, UBS Securities issued and sold Municipal

4    Derivatives to members of the Class.

5        41.    Defendant UBS Financial Services Inc. ("UBS Financial"), formerly

6    known as PaineWebber Inc., is a Delaware corporation with its principal place of business in New

7    York, New York. It is a subsidiary of UBS AG. In 2000, UBS Financial was purchased by

8    Defendant UBS AG. During the Class Period, UBS Financial issued and sold Municipal

9    Derivatives to members of the Class.

10        42.    Defendant Wachovia Bank, N.A. ("Wachovia N.A.") is a North Carolina

11    corporation with its principal place of business in Charlotte, North Carolina. During the Class

12    Period, Wachovia N.A. issued and sold Municipal Derivatives to Oakland and/or members of the

13    Class in the United States.

14        43.    Defendant Wachovia Corporation ("Wachovia") is a North Carolina

15    corporation with its principal place of business in Charlotte, North Carolina. During the Class

16    Period, Wachovia issued and sold Municipal Derivatives to Oakland and/or members of the Class

17    in the United States either directly or through its wholly-owned subsidiary Defendant Wachovia

18    Bank, N.A. ("Wachovia N.A.").

19            a.    In November, 2006, Wachovia received subpoenas from the

20    Antitrust Division of the United States Department of Justice and the Securities and Exchange

21    Commission in connection with those agencies' investigations into anticompetitive conduct in the

22    Municipal Derivatives business.

23            b.    Both the DOJ and the SEC have advised Wachovia that they

24    believe Wachovia N.A. employees engaged in improper conduct in relation to competitively-bid

25    municipal derivatives transactions.

26            c.    Two Wachovia N.A. employees working in the company's

27    Derivatives Marketing Department, Martin McConnell (the Managing Director of Marketing) and

28    Paul Jay Saunders (the Director of Marketing), recently disclosed that they are targets of the

1    grand jury convened in the Southern District of New York by the Antitrust Division of the

2    Department of Justice investigating antitrust and other violations related to anticompetitive

3    conduct in the Municipal Derivatives business. Target letters of the kind received by McConnell

4    and Saunders are an indication that the DOJ has substantial evidence of the commission of a

5    federal crime and typically a sign that the recipient will soon be indicted absent a plea agreement

6    or cooperation deal. Wachovia recently placed both Saunders – who worked for Defendant Bank

7    of America from 1998 through 2003 – and McConnell on administrative leave following their

8    disclosure that they were targets of the government's grand jury investigation.

9        44.    Defendant XL Asset Funding 1, LLC ("XLAF") is a Delaware limited

10   liability corporation maintaining its principal place of business in Schaumberg, Illinois. During

11   the Class Period, XLAF issued and sold Municipal Derivatives to Oakland and/or members of the

12   Class in the United States.

13        a.  ·  XLAF received subpoenas from the Antitrust Division of the

14   United States Department of Justice and the Securities and Exchange Commission in connection

15   with those agencies' investigations into anticompetitive conduct in the Municipal Derivatives

16   business.

17        45.    Defendant XL Life Insurance & Annuity Company ("XL Life Insurance")

18   is a subsidiary of XLAF maintaining its principal place of business in Schaumburg, Illinois.

19   During the Class Period, XL Life Insurance issued and sold Municipal Derivatives to Oakland

20   and/or members of the Class.

21        46.    Defendant XL Capital, Ltd. ("XL Capital") is a foreign corporation

22   maintaining its principal place of business in Hamilton, Bermuda. During the Class Period, XL

23   Capital, either directly or through its affiliates Defendants Security Capital and XL Asset Funding

24   1, LLC issued and sold Municipal Derivatives to Oakland and/or members of the Class in the

25   United States.

26        **Municipal Derivatives Broker Defendants**

27        47.    Defendant Cain Brothers & Company, LLC ("Cain") is a Delaware limited

28   liability corporation with its principal place of business in New York, New York. During the

1   Class Period, Cain acted as a broker for Oakland and/or members of the Class in purchasing

2   Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

3                  a.      Cain was subpoenaed by the SEC in connection with its

4   investigation of anticompetitive practices in the Municipal Derivatives industry.

5          48.     Defendant CDR Financial Products, Inc. ("CDR") is a Delaware

6   corporation maintaining its principal place of business at Beverly Hills, California.  During the

7   Class Period, CDR acted as a broker for Oakland and/or members of the Class in purchasing

8   Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

9                  a.      CDR's California offices were raided by the FBI in November,

10  2006, at the start of the government's investigation into anticompetitive conduct in the Municipal

11  Derivatives market.

12                 b.      CDR has been the subject of a series of long-standing federal

13  governmental investigations involving its dealings with other participants in the municipal

14  derivatives market, including Defendant Bank of America.

15         49.     Defendant Feld Winters Financial, LLC ("Feld Winters"), is a California

16  limited liability corporation with its principal place of business in Sherman Oaks, California.

17  During the Class Period, Feld Winters acted as a broker for Oakland and/or members of the Class

18  in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

19  Defendants.

20                 a.      Feld Winters was subpoenaed by the Justice Department in

21  connection with its investigation of anticompetitive conduct in the Municipal Derivatives

22  business.

23         50.     Defendant George K. Baum & Company ("Baum") is a Missouri

24  corporation with its principal place of business in Kansas City, Missouri.  During the Class

25  Period, Baum acted as a broker for Oakland and/or members of the Class in purchasing Municipal

26  Derivatives from one or more of the Municipal Derivatives Seller Defendants.

27                 a.      Baum was subpoenaed by the SEC in connection with its

28  investigation of anticompetitive practices in the Municipal Derivatives industry.

1          b.     Baum has been the target of previous governmental investigations

2  related to its Municipal Derivatives business.

3          c.     On November 10, 2006, Baum settled allegations with the IRS that

4  it diverted profits from municipal bond deals. In one instance the IRS alleged that bidding was

5  rigged in the selection of a GIC provider for a $150 million loan pool underwritten by Baum in

6  1999 and issued by the Illinois Development Finance Authority.

7          51.     Defendant Investment Management Advisory Group, Inc. ("IMAGE") is a

8  Pennsylvania corporation maintaining its principal place of business at Pottstown, Pennsylvania.

9  During the Class Period, IMAGE acted as a broker for Oakland and/or members of the Class in

10  purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

11  Defendants.

12          a.     IMAGE's Pennsylvania offices were raided by the FBI in

13  November, 2006, at the start of the government's investigation into anticompetitive conduct in the

14  Municipal Derivatives market.

15          52.     Defendant Morgan Keegan & Co., Inc. ("Morgan Keegan"), a subsidiary of

16  Regions Financial Corp., is a Tennessee corporation maintaining its principal place of business in

17  Memphis, Tennessee. During the Class Period, Morgan Keegan acted as a broker for Plaintiff

18  and/or members of the Class in purchasing Municipal Derivatives from one or more of the

19  Municipal Derivatives Seller Defendants.

20          a.     Morgan Keegan has received a subpoena from the Securities and

21  Exchange Commission in connection with the SEC's investigation into anticompetitive practices

22  in the Municipal Derivatives industry.

23          53.     Defendant PackerKiss Securities, Inc. ("PackerKiss") is a Florida

24  corporation maintaining its principal place of business in Delray Beach, Florida. During the

25  Class Period, PackerKiss acted as a broker for Plaintiff and/or members of the Class in

26  purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

27  Defendants.

28

1        54.    Defendant Shockley Financial Corp. ("Shockley"), a subsidiary of NelNet

2    Inc., is a corporation maintaining its principal place of business in Aurora, Colorado.  During the

3    Class Period, Shockley acted as a broker for Plaintiff and/or members of the Class in purchasing

4    Municipal Derivatives from one or more of the Municipal Derivatives Seller Defendants.

5        55.    Defendant Sound Capital Management, Inc. ("Sound Capital") is a

6    Minnesota corporation maintaining its principal place of business at Eden Prairie, Minnesota.

7    During the Class Period, Sound Capital acted as a broker for Oakland and/or members of the

8    Class in purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

9    Defendants.

10        a.    Sound Capital's Minnesota offices were raided by the FBI in

11    November, 2006, at the start of the government's investigation into anticompetitive conduct in the

12    Municipal Derivatives market.

13        56.    Defendant Winters & Co. Advisors, LLC ("Winters") is a California

14    limited liability company maintaining its principal place of business in Los Angeles, California.

15    During the Class Period, Winters acted as a broker for Plaintiff and/or members of the Class in

16    purchasing Municipal Derivatives from one or more of the Municipal Derivatives Seller

17    Defendants.

18                            **CO-CONSPIRATORS**

19        57.    Various other persons, firms and corporations, not named as Defendants

20    herein, have participated as co-conspirators with Defendants and have performed acts and made

21    statements in furtherance of the conspiracy.

22        58.    Whenever in this Complaint reference is made to any act, deed or

23    transaction of any corporation, the allegation means that the corporation engaged in the act, deed

24    or transaction by or through its officers, directors, agents, employees or representatives while they

25    were actively engaged in the management, direction, control or transaction of the corporation's

26    business or affairs.

27

28

756814.3                            - 20 -                    CLASS ACTION COMPLAINT

## CLASS ACTION ALLEGATIONS

59.    Oakland brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All state, local or municipal Government Entities and private entities in the United States and its territories that purchased Municipal Derivatives directly from one or more of the Municipal Derivatives Seller Defendants and/or through one or more of the Derivatives Broker Defendants at any time from January 1, 1992 through December 31, 2007. Excluded from the Class are all federal governmental entities and instrumentalities of the federal government.

60.    Oakland does not know the exact number of Class members because such information is in the exclusive control of Defendants. But due to the nature of the trade and commerce involved, Oakland believes that there are hundreds or thousands of Class members as described above, the exact number and their identities being known by Defendants.

61.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

62.    There are questions of law and fact common to the Class, including:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the effective prices of Municipal Derivatives sold in the United States;

b.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to rig bids for Municipal Derivatives sold in the United States;

c.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to allocate customers and the markets for Municipal Derivatives sold in the United States;

d.    The identity of the participants of the alleged conspiracy;

e.    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

1          f.      Whether the alleged conspiracy violated Section 1 of the Sherman

2    Act, 15 U.S.C. § 1;

3          g.      Whether the conduct of Defendants and their co-conspirators, as

4    alleged in this Complaint, violated the California Cartwright Act, Cal. Bus. & Prof. Code §

5    16720, *et seq.*;

6          h.      Whether the conduct of Defendants and their co-conspirators, as

7    alleged in this Complaint, violated the California Unfair Competition Law, Cal. Bus. & Prof.

8    Code § 17200, *et seq.*;

9          i.      Whether the conduct of Defendants and their co-conspirators, as

10   alleged in this Complaint, caused injury to the business or property of the Oakland and the other

11   members of the Class;

12          j.      The effect of the alleged conspiracy on the effective prices of

13   Municipal Derivatives sold in the United States during the Class Period;

14          k.      Whether the Defendants and their co-conspirators fraudulently

15   concealed the conspiracy's existence from the Oakland and the other members of the Class; and

16          l.      The appropriate class-wide measure of damages.

17      63.     Oakland is a member of the Class, Oakland's claims are typical of the

18   claims of the Class members, and Oakland will fairly and adequately protect the interests of the

19   Class.  Oakland is a direct purchaser of Municipal Derivatives, and its interests are coincident

20   with, and not antagonistic to, those of the other members of the Class.

21      64.     Oakland is represented by counsel who are competent and experienced in

22   the prosecution of antitrust and class action litigation.

23      65.     The prosecution of separate actions by individual members of the Class

24   would create a risk of inconsistent or varying adjudications, establishing incompatible standards

25   of conduct for Defendants.

26      66.     The questions of law and fact common to the members of the Class

27   predominate over any questions affecting only individual members, including legal and factual

28   issues relating to liability and damages.

7568143                              - 22 -                    CLASS ACTION COMPLAINT

1    67.    A class action is superior to other available methods for the fair and

2    efficient adjudication of this controversy. The Class is readily definable and is one for which

3    records should exist. Prosecution as a class action will eliminate the possibility of repetitious

4    litigation. Treatment as a class action will permit a large number of similarly situated persons to

5    adjudicate their common claims in a single forum simultaneously, efficiently, and without the

6    duplication of effort and expense that numerous individual actions would engender. This class

7    action presents no difficulties in management that would preclude maintenance as a class action.

8                         **TRADE AND INTERSTATE COMMERCE**

9    68.    The activities of Defendants and their co-conspirators, as described in this

10    Complaint, were within the flow of and substantially affected interstate commerce.

11    69.    During the Class Period, Defendants and their co-conspirators issued and

12    sold substantial quantities of Municipal Derivatives, in a continuous and uninterrupted flow of

13    interstate commerce to Government Entities located in states other than the states in which the

14    Municipal Derivatives Seller Defendants issued and/or brokered these products.

15    70.    The conspiracy in which the Defendants and their co-conspirators

16    participated had a direct, substantial, and reasonably foreseeable effect on United States

17    commerce.

18                                   **FACTS**

19                     **The Market for Municipal Derivatives**

20    71.    Municipalities and state and local government agencies issue over $2

21    trillion worth of municipal bonds annually.

22    72.    While the tax-free bonds are sold in contemplation of construction, public

23    housing or other public-works projects, municipalities have in the last decade opted to invest the

24    proceeds of the bond sales before these projects are even started, or to hedge the interest-rate risk

25    associated with the issuance of large amounts of tax-exempt debt.

26    73.    Municipal Derivatives have become an attractive investment vehicle for

27    municipalities looking to park bond proceeds until the money raised from the sale is actually

28    needed for capital projects, or to protect themselves from interest-rate risk associated with issuing

1   their tax-exempt bonds. There are roughly $40 - $60 billion in Municipal Derivatives created in
2   the United States annually.

3           74.    The market for Municipal Derivatives has become more concentrated since
4   the late 1990's, with an increasingly smaller number of investment banks and bond insurers
5   occupying the market.

6           75.    The Municipal Derivatives industry has been variously described by
7   market participants as opaque, intertwined and interconnected, all characteristics which facilitate
8   the type of illegal collusion alleged herein. The Municipal Derivatives market lacks transparency,
9   and regulatory and private efforts to impose transparency have not been successful. On July 26,
10  2007, the Chairman of the Securities and Exchange Commission delivered a white paper to
11  Congress calling for improved oversight of the municipal securities market.

12  **The Competitive Bidding Process**

13          76.    A wide variety of Municipal Derivatives are sold through competitive
14  bidding undertaken by Government Entities and overseen by the Municipal Derivatives Brokers
15  acting as their fiduciaries.

16          77.    The Competitive Bidding Process involving GICs is illustrative of the way
17  many Government Entities purchase Municipal Derivatives, and indicative of the methods by
18  which the Defendants have succeeded in manipulating these financial instruments pursuant to
19  their bid-rigging and customer allocation conspiracy.

20          78.    Flush with proceeds from a muni bond sale, a Government Entity looks to
21  invest in a GIC. The Government Entity will retain a GIC Broker to facilitate the acquisition of
22  the contract. The Government Entities typically pay a fee to the GIC Broker for shopping for
23  GIC Bids.

24          79.    In the wake of the so-called "yield-burning" scandal of the 1980's and
25  1990's – in which municipal bond issuers were sold overpriced investment vehicles or charged
26  fees that acted to artificially reduce the yields on their underlying bond issues – the IRS
27  promulgated regulations meant to ensure that Government Entities were purchasing Municipal
28  Derivatives at a fair market value price.

80.    IRS tax-exempt bond regulations (here, "Treasury Regulations") stipulate that if Government Entities invest the proceeds of bond sales, the yield of the investment cannot exceed the yield of the municipal bond itself. Any interest exceeding the bond rate of the tax-exempt bond investments is required to be rebated to the IRS, absent an exception.

81.    To satisfy these so-called arbitrage rules, any given GIC is structured to limit the rate of interest that a municipality can earn on the GIC to less than the yield of the bond whose issuance financed the investment in the GIC in the first place. The Rate of Return any particular Municipal Derivatives Seller can offer a Government Entity is therefore effectively capped.

82.    Treasury Regulations related to Municipal Derivatives are aimed at ensuring that Government Entities get competitive bids on the interest rate a Municipal Derivatives Seller pays the municipalities under the terms of the GIC. According to Treasury Regulations, a GIC is sold at "fair market value" if the bidding process satisfies certain procedures. Essentially, there should be at least three reasonably competitive bids solicited from Municipal Derivatives Sellers, and all of these bidders must have an equal opportunity to bid — that is, no bidder can have a "last look" to review other bids before bidding on the contract. Treasury Regulations state that a "reasonably competitive" Municipal Derivatives Seller is an entity with "an established industry reputation" as a competitive Municipal Derivatives Seller. The IRS may levy penalties under Section 6700 of the tax code when it determines bid-rigging has occurred.

83.    The Municipal Derivatives Broker, acting as the fiduciary to the Government Entity, oversees the solicitation and placement of the bids from Municipal Derivatives Sellers.

84.    After hiring a Municipal Derivatives Broker to oversee the solicitation of GIC Bids, Government Entities buy a GIC from a Municipal Derivatives Seller pursuant to the Competitive Bidding Process.

85.    The parties to a GIC are the Municipal Derivatives Seller, acting as the Counterparty and the Government Entity.  The Municipal Derivatives Seller now acting as the Counterparty supplies the most salient term, namely the Rate of Return on the investment.

86.    The GIC entitles the Government Entity to receive the return of the Government Entity's initial principal plus guaranteed interest at a specified Rate of Return, and to withdraw principal from the GIC as permitted.

87.    Generally, a Government Entity will acquire a GIC in order to invest funds on deposit in a debt service reserve fund or construction fund until it needs to use such funds to service debt or fund the payment of project expenses in accordance with the underlying bond documents.

88.    In exchange for the payment of a guaranteed Rate of Return to the Government Entity, and the full repayment of all principal on a date certain, the Municipal Derivatives Counterparty is allowed to invest the principal furnished by the Government Entity. The Municipal Derivatives Counterparty's profits are made on the spread between the Rate of Return the Municipal Derivatives Counterparty offers to the Government Entity and the returns the GIC's invested principal makes for the Municipal Derivatives Counterparty pursuant to whatever investment the Municipal Derivatives Counterparty chooses.

89.    The Competitive Bidding Process outlined in the Treasury Regulations mandates that any Government Entity seeking to buy a GIC receive at least three bona fide Bids from Municipal Derivatives Sellers.  Each bidder typically faxes its Bid into the Municipal Derivatives Broker, which collects the ostensibly competitive Bids and informs the Government Entity of the range of Bids, the identity of the Municipal Derivatives Sellers submitting them, and the time each Bid was received.

90.    Each GIC Bid includes a statement that the Bid was determined without regard to any other formal or informal agreement with another Municipal Derivatives Seller, and that the Bid was not submitted solely as a so-called "courtesy" Bid.

91.     The Municipal Derivatives Seller that offers the highest-yielding Rate of Return is selected as the Counterparty, often within hours of the close of the Competitive Bidding Process.

92.     The vast majority of GICs purchased in the United States are purchased pursuant to the competitive bidding process established by Treasury Regulation §1.148-5 *et seq.*, which has been in effect since approximately 1993, and which are only some of the Treasury Regulations governing the reinvestment of municipal bond proceeds.

93.     The entire GIC bidding and purchasing process, as well as those processes relating to the purchase of other types of Municipal Derivatives, is susceptible to abuse even when dealings involve sophisticated and experienced Government Entities.

94.     Even sophisticated Government Entities (who rely in large part on the Municipal Derivatives Broker Defendants acting as their fiduciaries) may not know that they are the target of the bid-rigging and customer allocation conspiracy alleged herein.

### The Bid-Rigging Conspiracy

95.     The potential for bid-rigging in any given GIC transaction exists in the exploitation of the Rate of Return that a particular GIC Seller is willing to offer to a Government Entity looking to invest its bond proceeds.  The Municipal Derivatives Seller Defendants, aided by the Municipal Derivatives Broker Defendants, have turned the Treasury Regulations into a travesty by exploiting Government Entities' need for reinvestment of bond proceeds.

96.     The Municipal Derivatives Seller Defendants, in concert with the Municipal Derivative Brokers, similarly exploited the elements of other types of Municipal Derivatives bought by Government Entities as part of their bid-rigging and customer allocation conspiracy.

97.     Bid-rigging of GIC transactions, which are illustrative of anticompetitive conduct in the overall market for Municipal Derivatives, typically occurs when only one firm submits a reasonable, financially viable Bid, and the other two or more bidders submit Bids offering unjustifiably low Rates of Return, or simply refuse (or "pass") on the opportunity to bid.

1       98.     Other times, bids are late or incomplete, leaving only one viable bid for the

2   Government Entity to choose from.

3       99.     Although at least one market participant has recently attempted to add

4   transparency to the market by developing a web-based bid auction service, GIC Bids are

5   traditionally done over the phone or sent to Municipal Derivatives Brokers via fax, facilitating

6   collusion of the type alleged herein.

7       100.    At least one investment bank has provided the government with transcripts

8   of telephone conversations that indicated that the investment bank and other market participants

9   were involved in anticompetitive conduct on Municipal Derivatives sold to Government Entities.

10      101.    While the winning bid may be financially viable in light of the Treasury

11  Regulations' restrictions on bond issue reinvestment, it is not necessarily at fair market value, and

12  does not necessarily provide the Government Entity with the best possible Rate of Return on the

13  investment it is seeking by buying the GIC.

14      102.    The unrealistically low bids – dubbed "courtesy bids" because they are

15  provided solely as a courtesy so that another Municipal Derivatives Seller can win on a bid that is

16  below fair market value – are often more than 100 basis points below the winning bid.  As Mark

17  Scott, director of the IRS tax exempt bond office, stated in *The Bond Buyer* on January 6, 2005,

18  "When a bid is 100 to 150 basis points below the market and there is no justification for that

19  being so low, one of the assumption you can draw is that there are courtesy bids being provided."

20      103.    Often the winning bid is the only one high enough to make the GIC work

21  and be a worthwhile reinvestment vehicle for the Government Entity.

22      104.    According to a speaker at a recent teleconference organized by the National

23  Association of Bond Lawyers and reported in *The Bond Buyer* on February 8, 2007, the use of

24  courtesy bids in GICs transactions is quite prevalent.  IRS officials have stated that bid-rigging is

25  a wide and pervasive practice in GIC transactions and have uncovered numerous transactions

26  involving rigged bids and customer allocation.  A number of these transactions involve both the

27  Municipal Derivatives Seller Defendants and the Municipal Derivatives Broker Defendants.

28

1     105.    Municipal Derivatives Brokers also routinely offer favored Municipal

2   Derivatives Sellers with an illegal "last look" at their competitors' submitted bids, or even

3   exclude potential bidders without the Government Entity's knowledge.

4     106.    Evidence seized by the federal government as part of its wide-ranging

5   investigation, including taped telephone conversations, revealed instances in which the winning

6   bidder was given a "last look" at other bids, or bidders were asked to bid low in exchange for

7   preferential treatment in later deals.

8     107.    As part of its ongoing investigation into these practices, the IRS also

9   uncovered several bidding schemes that allowed the Municipal Derivatives Seller to underpay for

10   the GIC – that is, provide a less than fair market value interest rate – and then overpay the

11   Municipal Derivatives Broker for other investment agreements or remarketing fees associated

12   with the GIC, a form of kickback that may jeopardize the tax-exempt status of the underlying

13   bond or result in excess "arbitrage" paid to the federal government.

14                    **Governmental Investigations of Defendants' Conspiracies**

15     108.    On Wednesday, November 15, 2006, the FBI began a series of nationwide

16   raids on numerous Municipal Derivatives Brokers, including the Municipal Derivatives Broker

17   Defendants.  The FBI raids coincided with the service of nearly two dozen subpoenas on other

18   participants in the Municipal Derivatives business, including the Municipal Derivatives Sellers

19   named as Defendants herein.

20     109.    The DOJ's Antitrust Division served subpoenas from a grand jury sitting in

21   the Southern District of New York, and a number of the targeted companies revealed that they

22   had also received subpoenas from the Securities and Exchange Commission in connection with a

23   parallel civil probe.

24     110.    The Antitrust Division is conducting a criminal probe into anticompetitive

25   conduct, including bid-rigging and customer allocation, and the DOJ is contemplating charging

26   market participants with continuing acts of conspiracy, and (as detailed above) have targeted a

27   number of individuals for indictment.

28

756814.3                              - 29 -                    CLASS ACTION COMPLAINT

1       111.   The SEC probe, entitled *In the Matter of Certain GIC Brokers*, is focused

2 on securities fraud in municipal bond deals undertaken since 2000. Upon information and belief,

3 the SEC is investigating Municipal Derivatives Sellers' non-disclosure of an extensive scheme

4 involving kickbacks to Municipal Derivatives Brokers, a scheme that acted as a necessary

5 corollary to the conspiracy alleged herein. Such non-disclosure of kickbacks to Municipal

6 Derivatives Brokers jeopardizes the tax-exempt status of Government Entities' bonds, or may

7 subject them to potentially excessive arbitrage payments to the federal government.

8       112.   The DOJ and SEC investigations follow a lengthy and continuing probe by

9 the IRS' Criminal Investigation Division and its Tax-Exempt Bond office.

10       113.   The Justice Department subpoenas asked for documents, e-mails, tapes or

11 notes of phone conversations and other information regarding "contracts involving the investment

12 or reinvestment of the proceeds of tax-exempt bond issues and qualified zone academy bonds [as

13 well as] related transactions involving the management or transferal of the interest rate risk

14 associated with those bonds, including but not limited to [GICs], forward supply, purchase or

15 delivery agreements; repurchase agreements; swaps; options; and swaptions."

16       114.   The subpoenas also demanded organizational charts, phone directories, and

17 lists of all employees involved with Municipal Derivatives, in addition to all documents

18 associated with what the subpoenas apparently described as "relevant municipal contracts

19 awarded or intended to be awarded pursuant to competitive bidding," which would include

20 invitations to bid; solicitations, notices or RFPs issued to any provider by municipal clients;

21 actual or proposed responses to those RFPs; and amounts and prices bid for the various

22 investment vehicles.

23       115.   On February 9, 2007, Defendant Bank of America announced that it

24 entered into a leniency agreement with the Justice Department in connection with what it

25 described as "the Department's investigation into anticompetitive practices in the municipal

26 derivatives industry."

27

28

116.    Defendant Bank of America noted that the amnesty grant "was the result of the company voluntarily providing information to the Department before the Department began its investigation, as well as the company's continuing cooperation."

117.    Entry into the DOJ's amnesty program follows presentation of evidence of a *per se* antitrust violation on behalf of the applicant, in this instance Defendant Bank of America. Evidence of Defendant Bank of America's dealings, including recorded telephone conversations of traders giving courtesy bids, was one of the key galvanizers of the criminal investigation. Key derivatives officials at the bank were placed on "administrative leave," including Dean Pinard, the head of BOA's derivatives department.

118.    Defendant Bank of America also disclosed that it had reached a $14.7 million settlement with the IRS relating to the company's role in providing GICs and other agreements to municipal bond issuers.

119.    As detailed in Paragraphs 16 to 53 above, a number of individuals have been targeted for indictment by the Department of Justice, and a number of Municipal Derivatives Seller Defendants are facing civil and administrative actions from the SEC in relation to that agency's investigation into anticompetitive practices in the Municipal Derivatives market.

## FRAUDULENT CONCEALMENT

120.    Oakland and members of the Class had no knowledge of the agreement, contract, combination, and conspiracy alleged in this Complaint, or of any facts that might have led to the discovery thereof, until shortly before the filing of this action. Oakland could not have discovered the agreement, contract, combination, and conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and methods of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their agreement, contract, combination, and conspiracy. These methods of secrecy included, but were not limited to, secret meetings, misrepresentations concerning the reasons for price increases, encouraging witnesses to give false testimony to the grand jury and government officials, and destroying or concealing evidence of their illegal conduct.

1       121.   The affirmative acts of the Defendants alleged herein, including acts in

2 furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

3 precluded detection.

4       122.   By their very nature, Defendants' bid-rigging and customer-allocation

5 conspiracy was inherently self-concealing. The Municipal Derivatives industry is not exempt

6 from antitrust regulation, and thus Oakland reasonably considered it to be a well-regulated

7 competitive industry.

8       123.   In the context of the circumstances surrounding Defendants' pricing

9 practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a

10 reasonable person that defendants' bidding and pricing were conspiratorial. Accordingly, a

11 reasonable person under the circumstances would not have been alerted to investigate the

12 legitimacy of Defendants' proffered Municipal Derivatives prices.

13       124.   Oakland and members of the Class could not have discovered the alleged

14 contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence

15 because of the deceptive practices and techniques of secrecy employed by Defendants and their

16 co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination or

17 conspiracy. Such practices are especially prevalent in bid-rigging and customer-allocation

18 conspiracies such as the one alleged herein.

19       125.   Because the alleged conspiracy was both self-concealing and affirmatively

20 concealed by Defendants and their co-conspirators, Oakland and members of the Class had no

21 knowledge of the alleged conspiracy, or of any facts or information that would have caused a

22 reasonably diligent person to investigate whether a conspiracy existed.

23       126.   As a result of Defendants' fraudulent concealment of their conspiracy, the

24 running of any statute of limitations has been tolled with respect to any claims that Oakland and

25 members of the Class have alleged in this Complaint.

26       127.   Throughout the Class Period, Defendants and their co-conspirators

27 affirmatively and fraudulently concealed their unlawful conduct.

28

128.    Oakland and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until before this litigation was commenced because Defendants and their co-conspirators used and continue to use deceptive and secret methods to avoid detection and to affirmatively conceal their violations.  Nor could Oakland or the Class members have discovered the violations earlier than that time because Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

129.    Defendants and their co-conspirators engaged in a successful anticompetitive conspiracy concerning Municipal Derivatives, which they affirmatively concealed, at least in the following respects:

a.    By meeting secretly to discuss effective prices, bids, and customers and markets of Municipal Derivatives in the U.S.;

b.    By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

c.    By intentionally creating the false appearance of competition by staging sham auctions in which the results were pre-determined; and

d.    By furnishing each other participant in all given bidding sessions with illegal "last looks" at their ostensible competitors' bids.

130.    Oakland and Class members did not know, and could not have discovered through reasonable diligence, that the auctions arranged by the Derivatives Broker Defendants were sham, and that rather than being competitive, the results of the auctions were rigged.

131.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Oakland's and the Class' claims have been tolled.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Violation of Section 1 of the Sherman Act)**

132.    From as early as January 1, 1992 through the present, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Municipal Derivatives in the United States in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

133.    The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially supracompetitive prices for Municipal Derivatives and to rig bids and to allocate customers and markets for Municipal Derivatives in the United States.

134.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

a.    participating in meetings and conversations among themselves during which they agreed to price Municipal Derivatives at certain levels, and otherwise to fix, increase, maintain or stabilize effective prices paid by Oakland and members of the Class with respect to Municipal Derivatives sold in the United States and to rig bids and allocate customers and markets of Municipal Derivatives;

b.    arranging sham auctions among the Municipal Derivatives Seller Defendants that were designed to create the appearance of competition for the sale of Municipal Derivatives, but in which the result had been agreed upon among the Defendants and co-conspirators;

c.    allocating customers and markets for Municipal Derivatives in the United States in furtherance of their agreements;

d.    rigging bids for Municipal Derivatives sold in the United States; and

e.    participating in meetings and conversations among themselves to implement, adhere and police the agreements they reached.

1    135. Defendants and their co-conspirators engaged in the actions described

2 above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease or

3 stabilize prices and to allocate customers and markets with respect to Municipal Derivatives.

4    136. The Defendants' unlawful contract, combination or conspiracy has had at

5 least the following effects:

6    a. Effective prices paid by Oakland and the members of the Class with

7 respect to Municipal Derivatives were fixed, stabilized and maintained at artificially low and non-

8 competitive levels in the United States;

9    b. Bids for Municipal Derivatives sold in the United States were

10 rigged;

11    c. Customers and markets for Municipal Derivatives were allocated

12 among Defendants and their co-conspirators;

13    d. Oakland and the other members of the Class paid more or received

14 lower Rates of Return for the Municipal Derivatives they purchased than they would have paid in

15 a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and

16 unlawful activities;

17    e. Price competition with respect to the sale of Municipal Derivatives

18 was restrained, suppressed and eliminated in the United States; and

19    f. As a direct and proximate result of the illegal combination, contract

20 or conspiracy, Oakland and the members of the Class have been injured and financially damaged

21 in their businesses and property, in amounts to be determined, by being deprived of the highest-

22 allowable interest rate on its Municipal Derivatives investment.  The courtesy (sometimes also

23 called complimentary) bids submitted by the Municipal Derivatives Sellers defrauded the

24 Government Entities by creating the appearance of competition to conceal the secretly deflated

25 interest rate offers.

26

27

28

**SECOND CLAIM FOR RELIEF**
**(Violation of the California Cartwright Act, Cal. Bus. & Prof. Code section 16720, *et seq.*)**

137.    Oakland, on behalf of itself and all others similarly situated, realleges and incorporates, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges against Defendants as follows.

138.    The unlawful conduct of Defendants, including the Defendants headquartered or based in California, was centered in and carried out within California, and Defendants' conduct within California injured all members of the Class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

139.    Beginning at least as early as January 1, 1992 through the present, the exact dates being unknown to Oakland, Defendants and various co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professional Code. Defendants, and each of them, have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of, allocate markets and rig bids for, Municipal Derivatives.

140.    For the purpose of forming and implementing the alleged combinations, trusts, agreements, understandings and concert of action, Defendants and their co-conspirators did those things they conspired to do, including but not limited to the acts alleged above, including actions:

       a.    to fix, raise, maintain and stabilize the price of Municipal Derivatives;

       b.    to allocate markets for Municipal Derivatives amongst themselves; and

       c.    to submit rigged bids for Municipal Derivatives.

141.    In formulating and carrying out the alleged combinations, trusts, agreements, understandings and concert of action, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were (a) to artificially raise, fix,

1   maintain, or stabilize the prices of Municipal Derivatives; (b) to allocate among themselves

2   Municipal Derivatives markets and customers; and (c) to facilitate, effectuate, and implement the

3   contract, combination, and conspiracy.

4          142.    The combination and conspiracy alleged herein has had the following

5   effects, among others:

6                  a.      Price competition in the sale of Municipal Derivatives has been

7   restrained, suppressed and/or eliminated in the State of California and throughout the United

8   States;

9                  b.      Prices for Municipal Derivatives sold by Defendants and their

10  co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-

11  competitive levels in the State of California and throughout the United States; and

12                 c.      Those who purchased Municipal Derivatives from Defendants and

13  their co-conspirators have been deprived of the benefit of free and open competition.

14         143.    As a direct and proximate result of the illegal combination, trust,

15  agreement, understanding and concert of action, Oakland and the members of the Class have been

16  injured in their business and property in that they paid more for Municipal Derivatives than they

17  otherwise would have paid in the absence of Defendants' unlawful conduct.

18         144.    As a result of Defendants' violation of Section 16720 of the California

19  Business and Professions Code, Oakland seeks treble damages and the costs of suit, including

20  reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and

21  Professions Code.

22                        **THIRD CLAIM FOR RELIEF**
                    **(Violation of the California Unfair Competition Law,**
23                    **Cal. Bus. & Prof. Code section 17200, *et seq.*)**

24         145.    Oakland, on behalf of itself and all others similarly situated, realleges and

25  incorporates, as if fully alleged herein, each of the allegations contained in the preceding

26  paragraphs of this Complaint, and further alleges against Defendants as follows.

27         146.    Defendants' unlawful conduct was centered in, carried out and perfected

28  mainly within the State of California, and Defendants' conduct within California injured all

1    members of the Class throughout the United States. Therefore, this claim for relief under

2    California law is brought on behalf of all members of the Class, whether or not they are

3    California residents.

4           147.   Beginning at least as early as January 1, 1992 and continuing to the

5    present, the exact dates being unknown to Oakland, Defendants committed acts of unfair

6    competition, as defined by Sections 17200, *et seq.* of the California Business and Professions

7    Code, commonly known as the Unfair Competition Law, by engaging in the acts and practices

8    specified above.

9           148.   Oakland and the members of the Class bring this claim pursuant to

10   Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution

11   and/or disgorgement from these Defendants for acts, as alleged herein, that violate the Unfair

12   Competition Law.

13          149.   Defendants' acts, omissions, misrepresentations, practices and non-

14   disclosures, as alleged herein, constitute a common course of conduct of unfair competition by

15   means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of

16   California Business and Professions Code, Section 17200, *et seq.*, in that, for example:

17                 a.    the violations of Section 16720, *et seq.*, of the California Business

18   and Professions Code, set forth above;

19                 b.    the acts described above violate the Sherman Act, 15 U.S.C. § 1;

20                 c.    Defendants' acts, omissions, misrepresentations, practices and

21   nondisclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the

22   California Business and Professions Code, and whether or not concerted or independent acts, are

23   otherwise unfair, unconscionable, unlawful or fraudulent;

24                 d.    Defendants' act and practices are unfair to consumers of Municipal

25   Derivatives in the State of California and throughout the United States, within the meaning of

26   Section 17200, California Business and Professions Code; and

27                 e.    Defendants' acts and practices are fraudulent or deceptive within

28   the meaning of Section 17200 of the California Business and Professions Code.

1    150.    Oakland and each of the Class members are entitled to full restitution

2    and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may

3    have been obtained by Defendants as a result of such business acts or practices.

4    151.    The unlawful and unfair business practices of Defendants, and each of

5    them, as described above, have caused Oakland and the members of the Class to pay supra-

6    competitive and artificially-inflated prices for Municipal Derivatives. Oakland and the members

7    of the class suffered injury in fact and lost money or property as a result of such unfair

8    competition.

9    152.    The conduct of Defendants as alleged in this Complaint violates

10   Section 17200 of the California Business and Professions Code.

11   153.    As alleged in this Complaint, Defendants and their co-conspirators have

12   been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair

13   competition. Oakland and the members of the Class are accordingly entitled to equitable relief

14   including restitution and/or disgorgement of all revenues, earnings, profits, compensation and

15   benefits which may have been obtained by Defendants as a result of such business practices,

16   pursuant to the California Business and Professions Code, Sections 17203 and 17204.

17   **PRAYER FOR RELIEF**

18   WHEREFORE, the Plaintiff prays for relief as follows:

19   1.    That the Court determine that this action may be maintained as a class

20   action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Oakland be

21   certified as a class representative and Oakland's counsel be appointed as counsel for the Class;

22   2.    That the unlawful contract, combination or conspiracy alleged be adjudged

23   and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the

24   Sherman Act and Section 16720, *et seq.*, of the California Business & Professions Code (the

25   Cartwright Act);

26   3.    That the unlawful contract, combination or conspiracy alleged be adjudged

27   and decreed to be unfair, fraudulent, and illegal in violation of Section 17200, *et seq.*, of the

28   California Business & Professions Code (the Unfair Competition Law);

756814.3                                    - 39 -                          CLASS ACTION COMPLAINT

1          4.      That Oakland and the Class recover damages and restitution, as provided

2    by law, determined to have been sustained as to each of them, in an amount to be trebled in

3    accordance with the antitrust laws, and that judgment be entered against defendants on behalf of

4    Oakland and of the Class;

5          5.      That Oakland and the Class recover their costs of the suit, including

6    attorneys' fees, as provided by law; and

7          6.      For such other and further relief as is just under the circumstances.

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

1

## DEMAND FOR JURY TRIAL

2     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

3   a jury trial as to all issues triable by a jury.

4

5   Dated: April 23, 2008                    By: _John A. Russ (by ssr_

6                                                    John A. Russo

7   John A. Russo, City Attorney (SBN 063203)
    *jrusso@oaklandcityattorney.org*

8   Barbara Parker, Chief Asst. City Attorney (SBN 069722)
    *bparker@oaklandcityattorney.org*

9   Mark Morodomi, Supervising Deputy City Attorney
    (SBN 120914)

10  *mmorodomi@oaklandcityattorney.org*
    Kathleen Salem-Boyd, Deputy City Attorney (SBN

11  100179)
    *ksalemboyd@oaklandcityattorney.org*

12  CITY OF OAKLAND
    One Frank H. Ogawa Plaza, 6th Floor

13  Oakland, California 94612
    Telephone:  (510) 238-3034

14  Facsimile:  (510) 238-6500

15  Richard M. Heimann (SBN 63607)
    *rheimann@lchb.com*

16  Joseph R. Saveri (SBN 130064)
    *jsaveri@lchb.com*

17  Eric B. Fastiff (SBN 182260)
    *efastiff@lchb.com*

18  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 30th Floor

19  San Francisco, CA  94111
    Telephone:    (415) 956-1000

20  Facsimile:    (415) 956-1008

21  James A. Quadra (SBN 131084)
    *quadra@meqlaw.com*

22  Sylvia Sokol (SBN 200126)
    *sokol@meqlaw.com*

23  MOSCONE, EMBLIDGE & QUADRA, LLP
    220 Montgomery Street

24  Mills Tower, Suite 2100
    San Francisco, CA 94104

25  Telephone:    (415) 362-3599
    Facsimile:    (415) 362-2006

26

27

28

756814 3                        - 41 -              CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Steven E. Fineman (SBN 140335)
*sfineman@lchb.com*
Daniel E. Seltz
*dseltz@lchb.com*
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY  10017
Telephone:    (212) 355-9500
Facsimile:    (212) 355-9592

*Attorneys for Individual and Representative Plaintiff
City of Oakland, California*

756814.3

- 42 -

CLASS ACTION COMPLAINT


COPY

JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

CITY OF OAKLAND, CALIFORNIA

### DEFENDANTS

SEE ATTACHMENT

**(b)** County of Residence of First Listed Plaintiff  Alameda County
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Eric B. Fastiff (State Bar No. 182260)
Lieff, Cabraser, Heimann & Bernstein, LLP
275 Battery St., 30th Floor
San Francisco, CA  94111
Tel: (415) 956-1000

Attorneys (If Known)

E-filing

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER** | & Disclosure Act | | ☐ 892 Economic Stabilization Act |
| | | **PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities— | ☐ 540 Mandamus & Other | **IMMIGRATION** | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | to Justice |
| | ☐ 446 Amer. w/Disabilities— | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | ☐ 950 Constitutionality of |
| | Other | | Alien Detainee | | State Statutes |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. Section 1
Brief description of cause:
Unlawfully rigging bids for municipal bond guaranteed investment contracts

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE
"NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
PLACE AND "X" IN ONE BOX ONLY)

☒ SAN FRANCISCO/OAKLAND          ☐ SAN JOSE

DATE
April 23, 2008

SIGNATURE OF ATTORNEY OF RECORD
Eric B. Fastiff

59620.1

## ATTACHMENT TO
## CIVIL COVER SHEET

I. (a)

THE CITY OF OAKLAND, on behalf of itself and all others similarly situated,

      Plaintiff,

v.

AIG FINANCIAL PRODUCTS CORP.; AIG SUNAMERICA LIFE ASSURANCE CO.; BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; BEAR STEARNS COMPANIES, INC.; CAIN BROTHERS & COMPANY, LLC; CDR FINANCIAL PRODUCTS, INC.; FELD WINTERS FINANCIAL, LLC; FINANCIAL GUARANTY INSURANCE CO.; FINANCIAL SECURITY ASSURANCE HOLDINGS, LTD.; FIRST SOUTHWEST COMPANY; GE FUNDING CAPITAL MARKET SERVICES, INC.; GENWORTH FINANCIAL, INC.; GEORGE K. BAUM & COMPANY; INVESTMENT MANAGEMENT ADVISORY GROUP, INC.; J.P. MORGAN CHASE & CO.; KINSELL NEWCOMB & DE DIOS, INC.; LEHMAN BROTHERS INC.; MERRILL LYNCH & CO. INC.; MORGAN KEEGAN & CO., INC.; MORGAN STANLEY; NATIONAL WESTMINSTER BANK plc; NATIXIS, S.A.; PACKERKISS SECURITIES, INC.; PIPER JAFFRAY & CO.; SECURITY CAPITAL ASSURANCE, INC.; SHOCKLEY FINANCIAL CORP.; SOCIÉTÉ GÉNÉRALE; SOUND CAPITAL MANAGEMENT, INC.; TRINITY FUNDING COMPANY, LLC; UBS AG; WACHOVIA BANK, N.A.; WACHOVIA CORPORATION; WINTERS & CO. ADVISORS, LLC; XL ASSET FUNDING COMPANY I LLC; XL CAPITAL, LTD.; and XL LIFE INSURANCE & ANNUITY COMPANY,

      Defendants.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CITY OF OAKLAND,

        Plaintiff(s),

     v.

AIG FINANCIAL PRODUCTS CORP,
        Defendant(s).

**E-filing**

No. C **08-02116 MEJ**

**ORDER SETTING INITIAL CASE
MANAGEMENT CONFERENCE
AND ADR DEADLINES**

IT IS HEREBY ORDERED that this action is assigned to the Honorable Maria-Elena James. When serving the complaint or notice of removal, the plaintiff or removing defendant must serve on all other parties a copy of this order , the Notice of Assignment of Case to a United States Magistrate Judge for Trial, and all other documents specified in Civil Local Rule 4-2. Counsel must comply with the case schedule listed below unless the Court otherwise orders.

IT IS FURTHER ORDERED that this action is assigned to the Alternative Dispute Resolution (ADR) Multi-Option Program governed by ADR Local Rule 3. Counsel and clients shall familiarize themselves with that rule and with the material entitled "Dispute Resolution Procedures in the Northern District of California" on the Court ADR Internet site at www.adr.cand.uscourts.gov. A limited number of printed copies are available from the Clerk's Office for parties in cases not subject to the court's Electronic Case Filing program (ECF).

### CASE SCHEDULE -ADR MULTI-OPTION PROGRAM

| Date | Event | Governing Rule |
|------|-------|----------------|
| 4/23/2008 | Complaint filed | |
| 7/10/2008 | *Last day to: | FRCivP 26(f) & ADR L.R.3-5 |
| | • meet and confer re: initial disclosures, early settlement, ADR process selection, and discovery plan | |
| | • file Joint ADR Certification with Stipulation to ADR Process or Notice of Need for ADR Phone Conference | Civil L.R. 16-8 |
| 7/24/2008 | *Last day to file Rule 26(f) Report, complete initial disclosures or state objection in Rule 26(f) Report and file Case Management Statement per attached Standing Order re Contents of Joint Case Management Statement (also available at http://www.cand.uscourts.gov) | FRCivP 26(a) (1) Civil L.R. 16-9 |
| 7/31/2008 | INITIAL CASE MANAGEMENT CONFERENCE (CMC) in Ctrm. B, 15th Floor, SF at 10:00 AM | Civil L.R. 16-10 |

\* If the Initial Case Management Conference is continued, the other deadlines are continued accordingly.

## Case Management Standing Order
## Magistrate Judge Maria-Elena James

San Francisco, Courtroom B, 15th Floor
Brenda Tolbert, Courtroom Deputy (415) 522-4708

1.      Civil Law & Motion is heard on Thursdays at 10:00 a.m. Counsel need not reserve a
        hearing date for civil matters, but should confirm Judge James' availability in the legal
        newspapers and on the district court web site, www.cand.uscourts.gov. Motions are
        governed by the Civil Local Rules and the Federal Rules of Civil Procedure. Motions for
        summary judgment shall be accompanied by a joint statement of undisputed facts in
        compliance with Civil L. R. 56-2(b).

2.      Criminal motions are scheduled with the courtroom deputy for any Thursday at 10:00
        a.m. when the judge is available, or during the regular criminal calendar while Judge
        James is on criminal duty. Motions are governed by the Federal Rules of Criminal
        Procedure and the Criminal Local Rules.

3.      Discovery disputes are governed by Judge James' discovery standing order, enclosed
        herewith and available on the Court's website.

4.      Counsel shall meet and confer prior to the Case Management Conference and file a Joint
        Case Management Conference Statement no later than seven days prior to the c.m.c. The
        statement shall address the information contained in the Joint Case Management
        Statement and [proposed] Case Management Order form, enclosed herewith and
        available on the Court's website.

5.      At least seven days prior to the c.m.c., each party shall file the magistrate jurisdiction
        consent/declination form, enclosed herewith and available on the Court's website. In the
        event that any defendant(s) files a motion to dismiss, defendant(s) shall file the
        consent/request form at the time the motion is filed and plaintiff(s) shall file the
        consent/declination form fourteen days thereafter, at the time the opposition is due.

6.      In all "E-Filing" cases, in addition to filing papers electronically, the parties shall lodge
        with chambers a printed copy of the papers by noon of the next court day following the
        day the papers are filed electronically. These printed copies shall be marked "Chambers
        Copy" and shall be submitted to the Clerk's Office in an envelope clearly marked
        "Magistrate Judge Maria-Elena James" and include the case number. Parties shall not
        file a paper copy of any document with the Clerk's Office that has already been filed
        electronically.

Dated: May 31, 2006                         _____

                                            Maria-Elena James
                                            United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

**STANDING ORDER RE: DISCOVERY AND DISPUTE PROCEDURES FOR CASES ASSIGNED OR REFERRED TO MAG. JUDGE MARIA-ELENA JAMES**

This standing order informs a *pro se* party and/or counsel of the specific procedures for all cases, except those categories of cases listed in Federal Rule of Civil Procedure ("FRCP") 26(a)(1)(E), assigned to Magistrate Judge Maria-Elena James for trial or referred for purposes of discovery. All parties and counsel are required to follow these procedures.

1.    Parties shall propound disclosures and discovery in accordance with FRCP 26 and 30-36, and Civil Local Rules 26, 30, 33, 34 and 36. A copy of the Civil Local Rules for the Northern District of California is available at the Clerk's Office or for public viewing at the Court's internet site - http://www.cand.uscourts.gov. All requests for protective orders must comply with Civil Local Rule 79-5. Pursuant to FRCP 30(a)(2), no more than ten depositions may be taken except by order of the Court. Pursuant to FRCP 33(a) and Civil Local Rule 33-3, no more than 25 interrogatories shall be propounded except pursuant to stipulation or order of the Court.

2.    The parties shall meet and confer regarding their initial disclosures pursuant to FRCP 26(f) and shall make disclosures pursuant to FRCP 26(a)(1)(E). The parties shall supplement their initial disclosures when required under FRCP 26(e)(1).

3.    The Court will not consider a formal motion to compel under Civil Local Rule 7. Instead, counsel must meet and confer **in person** for the purpose of resolving all disclosure and/or discovery disputes. Thereafter, if any disputes remain, counsel shall draft and file a jointly signed letter which (1) attests that prior to filing the joint letter the parties met and conferred **in person** for purposes of resolving the dispute; (2) sets forth the unresolved dispute and any pertinent factual background; and (3) states each party's position as supported by appropriate legal authority. The joint letter shall be signed by both parties, shall be limited to

1

five pages and may not be accompanied by exhibits or affidavits other than exact copies of disputed interrogatories, requests for production of documents and/or responses, privilege logs, and relevant deposition testimony. The parties need not state all disputes in one letter; rather, it is preferable that the parties file a separate letter for each dispute.

4.    In the event that counsel is unable to meet and confer with a party or opposing counsel as directed above, counsel shall file a written request for a telephonic conference for the purpose of enforcing the Court's requirement to meet and confer, or for the Court to fashion an alternative procedure which satisfies the meet and confer requirement. Counsel's written request shall state (1) three agreed upon prospective times and dates for the telephonic discovery conference to take place, (2) the anticipated length of the conference, and (3) the phone numbers at which counsel shall be contacted on the day of the conference. A copy of the written request shall be served on opposing counsel and verification of said service shall be filed with the request. Additionally, counsel shall file a declaration which states any attempt to meet and confer and the reasons for the inability to comply with this standing order. Counsel may attach exhibits to support the declaration, but the declaration and exhibits combined may not exceed seven pages. The Court will not excuse a party from the requisite in-person meeting unless good cause is shown.

5.    In the event that the parties are participating in a deposition or a site inspection and a discovery dispute arises regarding the deposition and/or site inspection, the parties may contact Judge James' Courtroom Deputy, Brenda Tolbert, at 415-522-4708, to inquire whether Judge James is available to resolve the parties' impending dispute telephonically. In the event that Judge James is unavailable or the parties are unable to contact Judge James' courtroom deputy for any reason, the parties shall proceed follow the procedures for requesting a telephonic conference as set forth in paragraph 4 above. The deposition or site inspection shall nevertheless proceed with objections noted for the record.

6.    In the event that a matter is to be taken off calender, or continued to a further date, a

2

written stipulation signed by the parties shall be filed with the Court for approval.

7.     Other than scheduling matters, pursuant to Civil L. R. 11-4(c), a party shall not contact the Court *ex parte* without prior notice to the opposing party. Further, all communications or questions to the Court shall be presented to the Court in writing and shall be properly filed. Parties must certify to the Court that all parties were served a copy of the written communication. Unless expressly requested by the Court, documents should not be faxed to chambers but should be filed or lodged in accordance with the Local Rules of Court.

8.     Parties shall not mail or fax to the Court copies of correspondence from a party regarding any dispute pending before the Court.

9.     Motions for sanctions shall be filed separately, pursuant to FRCP 37, and Civil Local Rules 7 and 37-3. Any party seeking an award of attorney's fees or other expenses in connection with a motion shall file a declaration with the opposition or reply memorandum which itemizes with particularity the fees and expenses claimed.

10.     In all "E-Filing" cases, in addition to filing papers electronically, the parties shall lodge with chambers a printed copy of the papers by noon of the next court day after filing. These printed copies shall be marked "Chambers Copy" and shall be submitted to the Clerk's Office in an envelope clearly marked "Magistrate Judge Maria-Elena James" and include the case number. Parties shall not file a paper copy of any document with the Clerk's Office that has already been filed electronically.

The failure of a party to abide by Judge James' Discovery and Disclosure Dispute Procedures may result in sanctions, pursuant to FRCP 16(f) and Civil Local Rule 37-3.

**IT IS SO ORDERED.**

Dated: May 31, 2006

MARIA-ELENA JAMES
United States Magistrate Judge

3

**NOTICE OF TRIAL ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE AND
ORDER TO FILE CONSENT/REQUEST FOR REASSIGNMENT FORM**

This civil case was randomly assigned to United States Magistrate Judge Maria-Elena
James for all purposes including trial. In accordance with Title 28, U.S.C. § 636(c), the
Magistrate Judges of this District Court are designated to conduct any and all proceedings in a
civil case, including a jury or non-jury trial, and to order the entry of final judgment, upon the
consent of the parties. An appeal from a judgment entered by Magistrate Judge James may be
taken directly to the United States Court of Appeals for the Ninth Circuit in the same manner as
an appeal from any other judgment of a district court.

You have the right to have your case assigned to a United States District Judge for trial
and disposition. Attached is the form which allows you to either consent to, or decline Judge
James' jurisdiction and request reassignment to a District Judge.

Each party shall sign and file the consent/declination form, either consenting to Judge
James' jurisdiction, or requesting reassignment to a District Judge, no later than the filing
deadline for the joint case management statement assigned by the initial case management
schedule.

**IT IS SO ORDERED.**

Date:   May 31, 2006

_____
Maria-Elena James
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

No. C         MEJ

Plaintiff(s),          **CONSENT TO ASSIGNMENT OR**
**REQUEST FOR REASSIGNMENT**

vs.

Defendant(s).
_____/

**CONSENT TO PROCEED BEFORE A UNITED STATES MAGISTRATE JUDGE**

In accordance with the provisions of 18 U.S.C. § 636(c), the undersigned party hereby consents to have a United States Magistrate Judge conduct any and all further proceedings in this case, including trial, and order the entry of final judgment, and voluntarily waives the right to proceed before a United States District Judge.

Dated:_____    Signed by: _____

                                     Counsel for: _____

**REQUEST FOR REASSIGNMENT TO A UNITED STATES DISTRICT JUDGE**

The undersigned party hereby declines to consent to the assignment of this case to a United States Magistrate Judge for trial and disposition and hereby requests the reassignment of this case to a United States District Judge.

Dated: _____    Signed by: _____

                                     Counsel for: _____

For the Northern District of California

**STANDING ORDER FOR ALL JUDGES OF THE NORTHERN DISTRICT OF CALIFORNIA**

CONTENTS OF JOINT CASE MANAGEMENT STATEMENT

Commencing March 1, 2007, all judges of the Northern District of California will require the identical information in Joint Case Management Statements filed pursuant to Civil Local Rule 16-9. The parties must include the following information in their statement which, except in unusually complex cases, should not exceed ten pages:

1.    Jurisdiction and Service: The basis for the court's subject matter jurisdiction over plaintiff's claims and defendant's counterclaims, whether any issues exist regarding personal jurisdiction or venue, whether any parties remain to be served, and, if any parties remain to be served, a proposed deadline for service.

2.    Facts: A brief chronology of the facts and a statement of the principal factual issues in dispute.

3.    Legal Issues: A brief statement, without extended legal argument, of the disputed points of law, including reference to specific statutes and decisions.

4.    Motions: All prior and pending motions, their current status, and any anticipated motions.

5.    Amendment of Pleadings: The extent to which parties, claims, or defenses are expected to be added or dismissed and a proposed deadline for amending the pleadings.

6.    Evidence Preservation: Steps taken to preserve evidence relevant to the issues reasonably evident in this action, including interdiction of any document-destruction program and any ongoing erasures of e-mails, voice mails, and other electronically-recorded material.

7.    Disclosures: Whether there has been full and timely compliance with the initial disclosure requirements of Fed. R. Civ. P. 26 and a description of the disclosures made.

8.    Discovery: Discovery taken to date, if any, the scope of anticipated discovery, any proposed limitations or modifications of the discovery rules, and a proposed discovery plan pursuant to Fed. R. Civ. P. 26(f).

9.    Class Actions: If a class action, a proposal for how and when the class will be certified.

10.    Related Cases: Any related cases or proceedings pending before another judge of this court, or before another court or administrative body.

11.    Relief: All relief sought through complaint or counterclaim, including the amount of any

-1-

damages sought and a description of the bases on which damages are calculated. In addition, any party from whom damages are sought must describe the bases on which it contends damages should be calculated if liability is established.

12.     Settlement and ADR: Prospects for settlement, ADR efforts to date, and a specific ADR plan for the case, including compliance with ADR L.R. 3-5 and a description of key discovery or motions necessary to position the parties to negotiate a resolution.

13.     Consent to Magistrate Judge For All Purposes: Whether all parties will consent to have a magistrate judge conduct all further proceedings including trial and entry of judgment.

14.     Other References: Whether the case is suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

15.     Narrowing of Issues: Issues that can be narrowed by agreement or by motion, suggestions to expedite the presentation of evidence at trial (e.g., through summaries or stipulated facts), and any request to bifurcate issues, claims, or defenses.

16.     Expedited Schedule: Whether this is the type of case that can be handled on an expedited basis with streamlined procedures.

17.     Scheduling: Proposed dates for designation of experts, discovery cutoff, hearing of dispositive motions, pretrial conference and trial.

18.     Trial: Whether the case will be tried to a jury or to the court and the expected length of the trial.

19.     Disclosure of Non-party Interested Entities or Persons: Whether each party has filed the "Certification of Interested Entities or Persons" required by Civil Local Rule 3-16. In addition, each party must restate in the case management statement the contents of its certification by identifying any persons, firms, partnerships, corporations (including parent corporations) or other entities known by the party to have either: (i) a financial interest in the subject matter in controversy or in a party to the proceeding; or (ii) any other kind of interest that could be substantially affected by the outcome of the proceeding.

20.     Such other matters as may facilitate the just, speedy and inexpensive disposition of this matter.

**CV 08    2116**    *MEJ*

---

# U.S. District Court Northern California

---

## ECF Registration Information Handout

---

The case you are participating in has been designated for this court's Electronic Case Filing (ECF) Program, pursuant to Civil Local Rule 5-4 and General Order 45.  This means that you **must** (check off the boxes ☑ when done):

    ☐  **1) Serve** this ECF Registration Information Handout on **all** parties in the case along with the complaint, or for removals, the removal notice. DO NOT serve the efiler application form, just this handout.

    Each attorney representing a party must also:

    ☐  **2) Register** to become an efiler by filling out the efiler application form.  Follow ALL the instructions on the form carefully.  If you are already registered in this district, do not register again, your registration is valid for life on all ECF cases in this district.

    ☐  **3) Email** (do not efile) the complaint and, for removals, the removal notice and all attachments, in PDF format within ten business days, following the instructions below.  You do not need to wait for your registration to be completed to email the court.

    ☐  **4)** Access dockets and documents using **PACER** (Public Access to Court Electronic Records).  If your firm already has a PACER account, please use that - it is not necessary to have an individual account. PACER registration is free.  If you need to establish or check on an account, visit: **http://pacer.psc.uscourts.gov** or call **(800) 676-6856**.

BY SIGNING AND SUBMITTING TO THE COURT A REQUEST FOR AN ECF USER ID AND PASSWORD, YOU CONSENT TO ENTRY OF YOUR E-MAIL ADDRESS INTO THE COURT'S ELECTRONIC SERVICE REGISTRY FOR ELECTRONIC SERVICE ON YOU OF ALL E-FILED PAPERS, PURSUANT TO RULES 77 and 5(b)(2)(D) (eff. 12.1.01) OF THE FEDERAL RULES OF CIVIL PROCEDURE.

**All subsequent papers submitted by attorneys in this case shall be filed electronically.  Unrepresented litigants must file and serve in paper form, unless prior leave to file electronically is obtained from the assigned judge.**

ECF registration forms, interactive tutorials and complete instructions for efiling may be found on the ECF website: **http://ecf.cand.uscourts.gov**

                              Version 5/14/2007

**Submitting Initiating Documents**
PDF versions of all the initiating documents originally submitted to the court · (Complaint or Notice of Removal, exhibits, etc.) must be **emailed (not efiled)** to the **PDF email box for the presiding judge** (not the referring judge, if there is one) **within 10 (ten) business days** of the opening of your case. For a complete list of the email addresses, please go to: **http://ecf.cand.uscourts.gov** and click on **[Judges]**.

You must include the case number and judge's initials in the subject line of all relevant emails to the court. You do not need to wait for your registration to email these documents.

These documents must be emailed instead of e-filed to prevent duplicate entries in the ECF system. All other documents must be e-filed from then on. You do not need to efile or email the Civil Cover Sheet, Summons, or any documents issued by the court at case opening; note that you do need to efile the Summons Returned.

**Converting Documents to PDF**
Conversion of a word processing document to a PDF file is required before any documents may be submitted to the Court's electronic filing system. Instructions for creating PDF files can be found at the ECF web site: **http://ecf.cand.uscourts.gov**, and click on **[FAQ]**.

**Email Guidelines:** When sending an email to the court, the subject line of the email **must** contain the **case number, judge's initials** and the **type of document(s)** you are sending, and/or the topic of the email.

**Examples:** The examples below assume your case number is 03-09999 before the Honorable Charles R. Breyer:

| Type of Document | Email Subject Line Text |
|---|---|
| Complaint Only | 03-09999 CRB Complaint |
| Complaint and Notice of Related Case | 03-09999 CRB Complaint, Related Case |
| Complaint and Motion for Temporary Restraining Order | 03-09999 CRB Complaint, TRO |

**Questions**
Almost all questions can be answered in our **FAQs** at
**http://ecf.cand.uscourts.gov,** please check them first.

You may also email the ECF Help Desk at ECFhelpdesk@cand.uscourts.gov or
call the toll-free ECF Help Desk number at: (866) 638-7829.

The ECF Help Desk is staffed Mondays through Fridays from
9:00am to 4:00pm Pacific time, excluding court holidays.

Version 5/14/2007

# WELCOME TO THE U.S. DISTRICT COURT, SAN FRANCISCO
## OFFICE HOURS:   9:00 A.M. TO 4:00 P.M.
### 415.522.2000
#### www.cand.uscourts.gov

**In Addition to the Local Rules, the Following Guidelines Have Been Provided to Ensure That the Filing Process Is Accomplished with Ease and Accuracy.  For Additional Information or Assistance, Please Call the above Number During Office Hours.**

1.  Documents are to be filed in the Clerk's Office at the location of the chambers of the judge to whom the action has been assigned.  We do not accept filings for cases assigned to judges or magistrate judges in the Oakland or San Jose division, per Civil L.R. 3-2(b).

2.  This office will retain the original plus one copy of most documents submitted. We will conform as many copies as you bring for your use.  Related cases require an extra copy for **each** related action designated.

3.  The copy retained goes directly to the assigned Judge.  Courtesy copies, or instructions for couriers to deliver a copy directly to chambers are inappropriate, unless you have been instructed to do so by court order.

4.  In order to facilitate the file stamping process, each original document should be submitted on top of its copies.  In other words, group like documents together--as opposed to a set of originals and separate sets of copies.

5.  The case number must indicate whether it is a civil or criminal matter by the inclusion of **C** or **CR** at the beginning of the number.  Miscellaneous and foreign judgment matters should also be indicated with initials **MISC** or **FJ** at the end of the case number.

6.  The case number must include the initials of the judge and/or magistrate judge followed by the letters designating the case Arbitration (**ARB**), Early Neutral Evaluation (**ENE**) or Mediation (**MED**)--if assigned to one of those programs.

7.  The document caption should include the appropriate judge or magistrate judge involved in a particular matter or before whom an appearance is being made.  This is especially important when submitting Settlement Conference Statements.

8.  Documents are to be stapled or acco-fastened at the top.  Backings, bindings and covers are not required.  Two holes punched at the top of the original document will facilitate processing.

9.  Appropriately sized, stamped, self-addressed return envelopes are to be included with proposed orders or when filing documents by mail.

10.   Proofs of service should be attached to the back of documents. If submitted separately, you must attach a pleading page to the front of the document showing case number and case caption.

11.   There are no filing fees once a case has been opened.

12.   New cases must be accompanied by a completed and signed Civil Cover Sheet, the filing fee or fee waiver request form and an original plus **two** copies of the complaint and any other documents. For Intellectual Property cases, please provide an original plus **three** copies of the complaint. Please present new cases for filing before 3:30 p.m., as they take a considerable amount of time to process.

13.   Copies of forms may be obtained at no charge. They may be picked up in person from the Clerk's Office forms cabinet or with a written request accompanied by an appropriate sized, stamped, self-addressed envelope for return. In addition, copies of the Local Rules may be obtained, free of charge, in the Clerk's Office or by sending a written request, along with a self-addressed, 10" x 14" return envelope, stamped with **$ 3.95** postage to: Clerk, U.S. District Court, 450 Golden Gate Avenue, 16th Floor, San Francisco, CA 94102.

14.   Two computer terminals which allow public access to case dockets and one terminal with information regarding files at the Federal Records Center (FRC) are located in the reception area of the Clerk's Office. Written instructions are posted by the terminals. Outside of the Clerk's Office, electronic access to dockets is available through PACER. To obtain information or to register call 1-800-676-6851.

15.   A file viewing room is located adjacent to the reception area. Files may be viewed in this area after signing the log sheet and presenting identification. Files are to be returned by **1:00 pm**  Under no circumstances are files to be removed from the viewing room.

16.   The Clerk's Office can only accept payment by **exact change or check** made payable to Clerk, U.S. District Court. No change can be made for fees or the public copy machine.

17.   Two pay copy machines are located in the file viewing room for public use, at fifteen cents ($.15) per page. Copy cards may be purchases at the snack bar on the first floor. Orders for copywork may be placed through Eddie's Document Retrieval by phoning 415-317-5556. Arrangements may be made to bring in a personal copier by calling the Clerk's Office in advance.

18.   We have a drop box for filing when the Clerk's Office is closed. Please see attached for availability and instructions.

## SAN FRANCISCO

| Article III Judges | Judges Initials | Magistrate Judges | Judges Initials |
|---|---|---|---|
| Alsup, William H. | WHA | Chen, Edward M. | EMC |
| Breyer, Charles R. | CRB | James, Maria-Elena | MEJ |
| Chesney, Maxine M. | MMC | Laporte, Elizabeth D. | EDL |
| Conti, Samuel | SC | Larson, James | JL |
| Hamilton, Phyllis J. | PJH | Spero, Joseph C. | JCS |
| Henderson, Thelton E. | TEH | Zimmerman, Bernard | BZ |
| Illston, Susan | SI | | |
| Jenkins, Martin J. | MJJ | | |
| Patel, Marilyn Hall | MHP | | |
| Schwarzer, William W | WWS | | |
| Walker, Vaughn R | VRW | | |
| White, Jeffrey S. | JSW | | |

## SAN JOSE

| Article III Judges | Judges Initials | Magistrate Judges | Judges Initials |
|---|---|---|---|
| Fogel, Jeremy | JF | Lloyd, Howard R. | HRL |
| Ware, James | JW | Seeborg, Richard | RS |
| Whyte, Ronald M. | RMW | Trumbull, Patricia V. | PVT |

## OAKLAND

| Article III Judges | Judges Initials | Magistrate Judges | Judges Initials |
|---|---|---|---|
| Armstrong, Saundra B. | SBA | Brazil, Wayne D. | WDB |
| Jensen, D. Lowell | DLJ | | |
| Wilken, Claudia | CW | | |

| San Francisco | 16th Floor | building closed between 6PM and 6AM | more info 415-522-2000 |
| San Jose | 2nd Floor | building closed between 5PM and 7:30AM | more info 408-535-5364 |
| Oakland | 1st Floor | building closed between 5:00 PM and 7:00 AM | more info 510-637-3530 |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### DROP BOX FILING PROCEDURES

1.     The drop box, located outside the Clerk's Office (see above chart), is available for the filing of documents before 9:00 a.m. and after 4:00 p.m. weekdays. Please note that access to the federal building is limited to 'normal business hours' (as noted in the chart above).

2.     The drop box may not be used for the filing of any briefs in support of, or in opposition to, any matter scheduled for a hearing within 7 calendar days. All such documents must be filed in the Clerk's Office during regular office hours by the date due.

3.     Using the electronic file stamping machine located next to the drop box, stamp each original document "Received" on the **back side of the last page.** Clerk's Office employees empty the box once each court day when the Clerk's Office opens to the public. The "Filed" date, which will be placed on original documents by Intake personnel, will be the same as the "Received" date, unless the "Received" date is a weekend or Court holiday. In those instances, the "Filed" date will be the first court day following the weekend or holiday. Documents placed in the drop box without a "Received" stamp will be filed as of the day the box is next emptied.

4.     After stamping each original and enclosing one copy for the court,* the documents must be placed in an orange court mailing pouch or red Expando folder provided for your convenience. *To facilitate processing of your documents, each original document should be submitted on top of its copies.* Prior to placing the pouch or folder in the drop box, please insert in the pouch or folder window a fully completed **Drop Box Filing Information Card.** You may use more than one pouch or folder per filing, *but a separate Information Card must be enclosed for each one.*
(*Please note that the Clerk's Office will retain two copies of all new complaints relating to patents, trademarks and copyrights.)

5. .    If you wish us to mail you one or more conformed copies that you have provided, you must enclose an appropriately sized, self-addressed, stamped envelope with adequate return postage. Alternatively, if you would like to pick up conformed copies, please mark your return envelope "**FOR MESSENGER PICK UP BY:  (NAME, FIRM)** ." Your copies will be available for pick-up **after 2:00 p.m.** on the day the drop box is emptied.

6.     A filing fee, if required, may be paid by check or money order, payable to "Clerk, U.S. District Court" in an exact amount. *Please do not enclose cash.*

7.     Documents deposited in the drop box must be in compliance with all local and federal rules, as appropriate. Documents filed "Under Seal" must be submitted in compliance with Civil L.R. 79-5.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NOTICE OF ASSIGNMENT OF CASE

TO A UNITED STATES MAGISTRATE JUDGE FOR TRIAL

Pursuant to General Order 44, the Assignment Plan of the United States District Court for the Northern District of California, this case has been randomly assigned to Magistrate Judge

**MARIA-ELENA JAMES**

Pursuant to Title 28 U.S.C. § 636(c), with written consent of all parties, a magistrate judge may conduct all proceedings in the case. Attached is a form to complete if you consent to proceed before the assigned magistrate judge and a form to complete if you decline to proceed before the assigned magistrate judge. Electronic versions of both forms are also available at the Court's Internet site: http://www.cand.uscourts.gov. Click on Forms-Civil. A party is free to withhold consent without adverse consequences. If a party declines to consent, the case will be randomly reassigned to a district judge and a case management conference will be scheduled on the district judge's calendar as close as possible to the date presently scheduled before the magistrate judge.

You must file your consent or declination by the deadline for filing the initial case management statement.

The plaintiff or removing party shall serve a copy of this notice and all attachments upon all other parties to this action pursuant to Federal Rules of Civil Procedure 4 and 5.

FOR THE COURT
RICHARD W. WIEKING, CLERK

By: Deputy Clerk

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

No. C

Plaintiff(s),

CONSENT TO PROCEED BEFORE A
UNITED STATES MAGISTRATE JUDGE

v.

Defendant(s).

CONSENT TO PROCEED BEFORE A UNITED STATES MAGISTRATE JUDGE

In accordance with the provisions of Title 28, U.S.C. Section 636(c), the undersigned party hereby voluntarily consents to have a United States Magistrate Judge conduct any and all further proceedings in the case, including trial, and order the entry of a final judgment. Appeal from the judgment shall be taken directly to the United States Court of Appeals for the Ninth Circuit.

Dated _____

_____
Signature

Counsel for _____
(Plaintiff, Defendant or indicate "pro se")

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  | No. C |
|---|---|
| Plaintiff(s), | DECLINATION TO PROCEED BEFORE A MAGISTRATE JUDGE AND REQUEST FOR REASSIGNMENT TO A UNITED STATES DISTRICT JUDGE |
| v. | |
| Defendant(s). _____/ | |

REQUEST FOR REASSIGNMENT TO A UNITED STATES DISTRICT JUDGE

The undersigned party hereby declines to consent to the assignment of this case to a United States Magistrate Judge for trial and disposition and hereby requests the reassignment of this case to a United States District Judge.

Dated: _____          Signature_____

Counsel for _____
(Plaintiff, Defendant, or indicate "pro se")

CT
a Wolters Kluwer business

111 Eighth Avenue
New York, NY 10011

**FIRST CLASS**

RECEIVED

JUN 2 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Richard W. Wieking, Clerk
United States District Court
Northern District of California
450 Golden Gate Avenue
16th Floor
San Francisco, CA 94102



neopost

0 49 J8 20
$ 02.¬
05/29/2
Mailed From
US POS